UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | )Criminal No. 21–CR–10217 | |
| | ) | |
| OSARETIN OMORUYI | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

The rainy season in Nigeria was always difficult.  It lasted months.  The rusted aluminum roof on their single–floor home leaked.  Rain constantly tapped on the concrete floor.  It was difficult keeping the house dry, especially at dark by kerosene lantern light.  The six of them would be lucky to receive even three hours of electricity a day.  No one knew when it would be available.  The lights would just turn on.  If it came on while mom was at work, and the kids were in school, then they missed it.  If a transformer blew, there might be a week without it.  If it came on at night, it was a time to study, press school uniforms, and put water in the fridge, to cool it just a little before the power inevitably cut out again.

And when it rained, it poured.  The backyard they used for fire was useless during these times.  Every meal was already hard to come by.  When there was no fire, it was the foot–tall table–top kerosene stove.  Water falling from the sky was juxtaposed with the lack of running water inside the house. There was no sink.  There was no shower.  Baths were by bucket.

1

Instead of a bathroom door, there was a sheet.  Bodily functions were carried out in a communal hole dug in the ground, located as far away from the home as possible, underneath a makeshift aluminum awning.  It would have to be moved periodically.

Things complicated when dad left for the United States to pursue religious missionary work.  Dad lost his job as a government auditor after a change in the last political regime.  Dad decided to pursue something else.  Mom was left to raise all five kids alone, as best she could.

She was a store owner, but not in a sense that some might understand it to be.  A supermarket, it was not.  It was the size of a small shipping container, filled with various wares.  It was sometimes necessary to move the store, which would require the help of others to lift it up, and a truck rental, since they owned no form of motorized transportation.  Usually, it was best to leave it where it was so customers would return.  She took the bus early in the morning, and came home late.

Years passed.  By this time, he obtained his National Diploma, and began working at Bolivia Table Water, a bottled water production facility.  He worked overnights.  As his shift ended and the dayshift arrived, one of his friends told him mom was sick and taken to Central Hospital. That was all he knew.  There were no cellphones or home phone.  He made the early morning mile-long walk to see about mom.

Nigerian hospitals are different.  This was his first visit.  Sick and injured people were strewn about everywhere, including on the floor, in hallways, with a wide array of medical problems.  Bloody people in bandages.  With respiratory issues.  With illness.  One time, he watched a person die while she was waiting to be seen.  The smell was gross.  It was a warehouse of malady.  Metal beds were arranged in a grid.  Each one buttressed by an ineffective three-inch foam mattress.  He checked in.  They told him where to see her.  He saw mom.

Mom wasn't right.  Mom couldn't respond.  Mom couldn't shake his hand.  The side of her face wouldn't move.  Her body seemed numb.

The doctor said mom suffered a stroke, fell, and sustained cranial trauma.  She was non-verbal, and half her body was paralyzed.  X-Rays or MRIs existed miles away, unless paid for.  She would need constant care and therapy.  Her blood pressure level was 300, so she would need medication.  He visited his mom every day for three weeks; despite the emotional toll in each visit.

They brought her home.  Every day, he helped her with her physical therapy.  Stretched her legs.  Gave her showers.  Cleaned up after her.  Made sure she took her medication.  He looked after his younger siblings in a way he hoped she would.

He missed her support, influence, and her motherly advice.

3

The crushing realization was that although she was at home, in every meaningful way, she was gone.  He stayed with her for the next seven years, until his younger siblings and other family were able to take over for mom's care.  It rained and poured.  Leaving was emotional.  He went to America.

He met Richard, who was a disabled individual at a group home.  By this time, he worked full-time as a patient care attendant ("PCA") for years.  He found the work rewarding in a way that he believed was karmically linked to mom.  He could not help her, but he knew he could help them in a similar context.

Richard was 65 years old, and diagnosed with several behavioral disorders.  At times, he was aggressive.  Richard loved to talk about his days working at BJ's in younger years.  He became Richard's sound board, where his co-workers could not.  It took patience.  He could calm Richard down.  He had a way with him, and helped monitor Richard's diet, in particular, his insistence on, and prolific ability to drink, can after can of soda.  When Richard needed redirection, he found the key.  They watched Richard's favorite show, Hogan's Heroes.  He cleaned Richard up after he soiled himself, and developed a routine with him to remind him to use the bathroom.  They played basketball.  They did arts and crafts.  They solved puzzles.  They went to the recreation center to associate with others in the community.  They became friends.

In his work as a PCA, he did for Richard what he did for so many of the individuals he supervised.  He enjoyed integrating them into their community.  He took pride in helping them with their day-to-day tasks and appointments.  He enjoyed being an advocate for their well-being.  He enjoyed helping those who could not help themselves.  The way he could not help mom.

He is Osaretin Omoruyi, and he has been convicted of the crimes charged.  It is raining, and it is pouring.  For the first time in his life, he is incarcerated.  He has no prior record.  Presently, the jury's verdict must be respected, and he will be sentenced.  Skeptics might say this information suggests Osaretin had a motive to commit the crimes charged.  On the other hand, Osaretin spent a significant portion of his adult life caring for others, some of whom were complete strangers, who needed help, care, and attention.  He provided that.

Sentencing in this case is as inevitable as his subsequent deportation to Nigeria.  Regardless of how the Court calculates the guideline sentence range, it is advisory.  Counsel requests that the Court should ultimately impose a fair and just sentence based on an individual assessment of Osaretin Omoruyi and the 3553(a) factors and the reasons set forth below.

**ARGUMENT**

I.    **Calculation of the defendant's guideline sentence range.**

**A. Loss Amount**

The PSR calculates the defendant's total attributable loss calculation to be $2,079,382.33.  That calculation vastly overstates Osaretin's level of culpability, his guideline sentence range, and calculation of a fair sentence.

A sentencing process driven largely by a finding of loss, as in this case and in most fraud cases, ignores many important elements of Section 3553(a). In this case, U.S.S.G. §2B1.1 provides for a 16-level increase to the offense level based on economic loss.

Courts have often recognized that the financial guideline is crude and frequently ill-fitting. As Judge Rakoff poignantly observed in *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012):

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

Judge Rakoff observed in an earlier decision, "[a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as the weight of drugs in narcotics cases or the amount of

financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson,* 441 F.Supp.2d 506,510 (S.D.N.Y. 2006), *aff'd301* Fed.Appx. 93 (2d Cir. 2008), *citing generally* Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).  In *Adelson,* Judge Rakoff ultimately imposed a sentence of three and one-half years, notwithstanding an advisory guideline range of life imprisonment. The Court called the Guidelines "wildly off-base," *id.* at 515, and called attention to "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings *if **not cabined by common sense.**" Id.* at 512 (emphasis added).

Judge Rakoff is not the only judge to emphasize the irrationality, and total absence of humanity, in sentencing a human being based principally, if not exclusively, on the Guidelines loss table. In a concurring opinion in *United States v. Corsey,* 723 F.3d 366, 379-80 (2nd Cir. 2013), Judge Underhill (United States District Court for the District of Connecticut, sitting by designation) made the following observation:

> The Sentencing Commission set the original 1987
> Guidelines for economic offenses higher than historical
> sentences in order to further the deterrence and just
> punishment goals of sentencing. In 1989, in response to
> the savings and loan crisis, Congress passed legislation

increasing the maximum penalties for financial fraud
offenses and directing the Sentencing Commission to
include specific offense characteristic enhancements in
the fraud guideline... In 2001, the Sentencing
Commission amended the Guidelines to combine the fraud,
theft and embezzlement, and property destruction
guidelines into a single guideline, section 2B1.1. That
change was accompanied by the publication of a new loss
table that had the effect of increasing offense level
calculations, especially for high-dollar value crimes…
Most recently, the fraud guideline was amended in 2003
in response to Congressional directives in the Sarbanes-
Oxley Act. Those amendments included further changes to
the loss table that added offense level points in the
highest loss cases. U.S.S.G. app. C amend. 647 (Nov. 1,
2003). The three sets of amendments to the loss table of
the fraud guideline alone have effectively multiplied
several times the recommended sentence applicable in
1987 for large-loss frauds, which itself was set higher
than historic sentences.

*Corsey,* at 379–80 (internal citations omitted). *See also United
States v. Musgrave,* 647 F. App'x 529, 538 (6th Cir. 2016)
("[T]here is reason to believe that, because the loss Guidelines
were not developed using an empirical approach based on data
about past sentencing practices, it is particularly appropriate
for variances.").

The defendant objects to the PSR's calculation of his
attribution of overall loss.[1]  As stated above, it overstates
his level of culpability both in the guidelines, as well as the

---

[1] The defendant argues the government's mere listing of names, persons, and
amounts as indicated in the PSR, without more is insufficient to establish:
(1) that named persons other than those who testified at trial were
defrauded; (2) that any other such payment was made pursuant to fraud; (3)
that the defendant caused the loss, (because he did not defraud the victims);
(4) that funds were delivered in furtherance of a conspiracy attributable to
the defendant; and (5) are ultimately attributable to the defendant for
sentencing purposes, either in terms of relevant conduct or restitution.

requisite 3553(a) factors.  Neither Henry nor Osemwege's calculated amounts should not apply to Osaretin.

Macpherson Osemwege's indictment stems back to 2017, approximately two years prior to the defendant's indictment date range, which was 2019.  Osemwege's total loss amount is calculated as $203,206.53.  PSR ¶39.  There is relative lack of association between Osaretin and Osemwege, both in terms of personally and financially.  More significantly, the PSR contains no information regarding when certain transactions were made, and more significant for the Court, whether these transactions were made prior to the date the government's indictment alleges the defendant joined the conspiracy.  Either way, it fails to establish that any loss amount attributable to Osemwege should be attributable to Osaretin.

The losses attributable to Henry should also not apply to Osaretin.  Biologically, they are brothers.  They have been convicted of the same offenses.  But those facts alone fail to establish jointly undertaken criminal activity regarding scope, furtherance of criminal activity, or what the court should calculate was "reasonably foreseeable" pursuant to relevant conduct principles.

Regardless of the technical calculation of the guideline sentence range regarding loss, the amalgamation of every single dollar and cent flowing through each of these accounts is

insufficient to establish that it is attributable loss to
Osaretin, even considering relevant conduct principles, and even
then, the final calculation overstates Osaretin's conduct.

**B. Application of §4C1.1 (Zero Point Offender)**

Notably, the United States Sentencing Commission appears to
agree that defendants who have absolutely no history of criminal
involvement are deserving of sentences below the nominal
guideline range that would otherwise apply.  It has promulgated
an amendment to the Sentencing Guidelines, §4C1.1, entitled
"Adjustment for Certain Zero-Point Offenders," which provides
for an additional two-point reduction in the Total Offense
Level.

It is anticipated this amendment will go into effect on
November 1, 2023, absent Congressional intervention.  It is also
anticipated that this amendment will be made retroactive to
Zero-Point offenders in custody, which is why counsel did not
seek a continuance.

The two-level reduction should apply in this case.  The
government and probation argue that it does not apply because of
the proposed exception in §4C1.1(a)(6).  Essentially, a Zero-
Point offender will receive a two-level reduction at sentencing
unless, pertinent here, "the defendant did not personally cause
substantial financial hardship."  In this case, Osaretin is a
defendant who did not "personally cause" a "substantial

financial hardship", and thus should be eligible for the two-level reduction.

There is no definition within §4C1.1 regarding "substantial financial hardship."  The same term, however is defined in other areas within the USSG, notably §2B1.1(b)(2), Application Note 4(F), which states:

> In determining whether the offense resulted in substantial
> financial hardship to a victim, the court shall consider,
> among other factors, whether the offense resulted in the
> victim:

(i)     Becoming insolvent;
(ii)    Filing for bankruptcy under Bankruptcy Code (title 11,
        United States Code);
(iii)   Suffering substantial loss of a retirement, education,
        or other savings or investment fund;
(iv)    Making substantial changes to his or her employment,
        such as postponing his or her retirement plans;
(v)     Making substantial changes to his or her living
        arrangements, such as relocating to a less expensive
        home; and
(vi)    Suffering substantial harm to his or her ability to
        obtain credit.

In this case, the government and probation allege that the defendant caused substantial financial hardship to Patricia Casacchia and/or Linda Varner.  There is no allegation that Osaretin had any contact with either, or any of the persons purportedly defrauded, including those who testified at trial. Therefore, based on the plain language of the proposed guideline, the defendant did not personally cause any financial

hardship at all, let alone a substantial one.

Although proposed §4C1.1 is silent whether substantial financial hardship need be borne from the defendant's direct conduct, rather than the scope of the conspiracy, in evaluating whether an exception to the rule is to apply, the clear purpose of the new rule was to consider the defendant's conduct alone.

The proposed rule focuses solely on calculation of the criminal history points of the defendant at issue, and no one else.  Also, other contexts within the USSG regarding leniency for persons with few/no criminal history points suggest that the focus should be on the defendant's actions, and not governed by §2B1.1 relevant conduct principles. (See, 5C1.2(a)(2), which disqualifies a defendant from a safety valve reduction if the defendant <u>personally possessed</u> a weapon).  Viewing his role here, Osaretin was not the defrauder of the victims.

In this case, as a matter of policy, it would be unfair to disqualify Osaretin from the two-level reduction based on offense-specific conduct, especially where probation concluded that a §2B1.1(b)(2)(A) enhancement applied for the number of victims, but not one for substantial financial hardship.

Without a clear definition, and where the interpretation is ambiguous at best, the rule of lenity requires the court apply the rule most favorable to the defendant, Osaretin.

### C. Minor/Minimal Role in the Conspiracy

12

Pursuant to §3B1.2, the Sentencing guidelines permit a two to four level decrease if the defendant was a minimal or minor participant in criminal activity.  Osaretin fits within this category.

Even under the government's theory, Osaretin created bank accounts through which money was transferred.  There is no evidence he spent time mining, cultivating, targeting, or contacting any persons/victims whatsoever.  For that, there apparently exists a host of other persons who are not Osaretin that masterminded this plot.  He was used as a tool.  The search warrant executed at Osaretin's residence did not simply yield the identifications referenced in the PSR.  He was not the only resident of 20 Bailey Court.  In that space, agents found multiple forms of false identification of other persons not charged in the conspiracy.  Osaretin's legitimate passport was located in a different area than the ones that were falsified.

There is no evidence Osaretin performed front-end fraud.[2] That is, there is no evidence he ever engaged, targeted, or cultivated any victim whatsoever.  The government's suggested sentence appears to punish him as if he did, but that would be

_____

[2] Contextually, the mere opening of bank accounts fails to satisfy enhancements for sophisticated means, or use of authentication features.  The mere existence of the Nelson Bright passport is insufficient to establish that Osaretin opened those accounts, or controlled the transactions.  None of the government's trial witnesses were able to identify whom opened the accounts, what identification was used, or who authorized any particular transaction.  Furthermore, the defendant asserts the government has failed to prove an enhancement under §2B1.1(b)(9)(A).

untrue.

Macpherson Osemwege entered into an agreement with the
government long before undersigned counsel begun representation
of Osaretin.  His indictment dates back to 2017.  This was years
before the allegations against Osaretin.  The government claims
they conspired together, but fails to recognize that it was
Osemwege that spearheaded the operation, not Osaretin.  Osaretin
was a pawn in a larger game.

There was not a single witness to say that it was Osaretin
who walked into a bank and opened a Nelson Bright account.
There was no witness, and no video or photographic evidence to
establish that it was him amongst other persons.

In fact, evidence at trial showed that different persons,
not Osaretin, had access to, and made transactions on, the
Nelson Bright accounts.  Furthermore, certain transactions on
the accounts occurred during a time in which government
witnesses acknowledged at trial that Osaretin was out of the
country, based on his passport/travel information.

All of this suggests not only that he should not be
responsible for the "loss" amounts associated with any account,
but also that to the extent he participated in the conspiracy,
it was a minor or minimal role pursuant to §3B1.2.  He did not
receive significant personal gain.  He lived in a small multi-
unit apartment complex in Canton.

He was convicted of bank fraud and money laundering.  He was not at all a participant of the front end of the any offense, or any particular person who might have lost anything.

**D.    Sentencing Disparities**

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). The PSR includes certain data regarding dispositions for defendants in the last five fiscal years,

Importantly, the JSIN data neither considers nor relays defendants' race, country of origin, family history, background, or other mitigating factors into account. Nor does the data meaningfully include those cases where defendants were sentenced to *time-served sentences*, which potentially and significantly skews the results. As a result, it may be difficult for the Court to draw easy comparisons between those cases and this one.   Thus, his request for a below- guideline sentence in this case is supported, regardless of  the limited statistics and data provided from the Sentencing Commission.

**II.    THE COURT MUST IMPOSE A SENTENCE THAT SATISFY THE GOALS OF SECTION 3553(a)**

**A.    The history and characteristics of the defendant.**

Osaretin Omoruyi is a dedicated father and son.  He worked on

15

a daily basis.  Upon this sentence, he will leave behind
everything he knows in this country.  He will be deported.

**B.    The nature and circumstances of the offense.**

Osaretin opened bank accounts through which money flowed.
He was not involved in any of the fraud regarding the persons
who sent the money.  He was convicted of offenses that did
not involve the use of weapons, drugs, threats, or violence.

**C.    The sentencing rationales set forth in 18 U.S.C. §
3553(a)(2) support the imposition of a sentence of time
served.**

In addition to the personal characteristics of the
defendant and the nature and circumstances of the offense,
section 3553(a) directs the Court to consider the need for the
sentence imposed:

    (A)    to reflect the seriousness of the offense, to
              promote respect for the law, and to provide just
              punishment for the offense;
    (B)    to afford adequate deterrence to criminal conduct;
    (C)    to protect the public from further crimes of the
              defendant; and
    (D)    to provide the defendant with needed educational or
              vocational training, medical care, or other
              correctional treatment in the most effective
              manner.

18 U.S.C. § 3553(a)(2).

Osaretin had never committed a crime in his life.  He now
exists in a human cage, and will remain there for years, and as
long as the Court deems appropriate.  He will then be deported.
In that way, the jury's verdict and the sentence imposed must be

respected.

**D.   Kinds of Sentences Available**

This Court must consider all of "the kinds of sentences available" by statute, 18 U.S.C. § 3553(a)(3), even if the "kinds of sentence … established [by] the guidelines" zones recommend only a lengthy prison.  *See Gall*, 552 U.S. at 59 & n.11.  Further, Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury."  28 U.S.C. § 994(j).  Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service."  *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

17

## CONCLUSION

For the reasons stated above, the defendant prays that this Honorable Court impose a fair and just sentence in light of the defendant's request.  The defendant can and will supplement this memorandum with supporting documentation.


Respectfully submitted,

OSARETIN OMORUYI
By his attorney,

/s/*Austin C. Tzeng*                            Dated: October 27, 2023
Austin C. Tzeng
The Law Office of Austin C. Tzeng
21 Mayor Thomas J. McGrath Highway
Suite 501
Quincy, MA  02169
781-929-4882
tzengdefense@gmail.com


### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 27, 2023.

/s/*Austin C. Tzeng*                
Austin C. Tzeng