1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,          )
                                        )
4              Plaintiff                )
                                        )
5         -VS-                          ) Criminal No. 21-10217-PBS
                                        ) Pages 1 - 93
6    OSAKPAMWAN HENRY OMORUYI, a/k/a    )
     "Clifford Bernard" or "Bernard     )
7    Clifford" and                      )
                                        )
8    OSARETIN GODSPOWER OMORUYI,        )
     a/k/a "Nelson Bright" or "Bright   )
9    Nelson,"                           )
               Defendants               )
10

11                       **SENTENCING**

12

13         BEFORE THE HONORABLE PATTI B. SARIS
              UNITED STATES DISTRICT JUDGE

14

15

16

17

18
                        United States District Court
19                      1 Courthouse Way, Courtroom 19
                        Boston, Massachusetts  02210
20                      October 31, 2023, 10:45 a.m.

21

22
                           LEE A. MARZILLI
23                      OFFICIAL COURT REPORTER
                      United States District Court
24                     1 Courthouse Way, Room 7200
                          Boston, MA  02210
25                        leemarz@aol.com

1    A P P E A R A N C E S:

2        CHRISTOPHER J. MARKHAM, ESQ., Assistant United States
     Attorney, Office of the United States Attorney, 1 Courthouse
3    Way, Room 9200, Boston, Massachusetts, 02210, for the
     Plaintiff.

4
         PETER C. HORSTMANN, ESQ., Law Offices of Peter Charles
5    Horstmann, 450 Lexington Street, Newton, Massachusetts, 02466,
     for the Defendant Osakpamwan Henry Omoruyi.

6
         AUSTIN C. TZENG, ESQ. and SUSAN COSTA, ESQ.,
7    Law Office of Austin C. Tzeng, Suite 501, 21 Mayor Thomas J.
     McGrath Highway, Quincy, Massachusetts, 02169, for the
8    Defendant Osaretin Godspower Omoruyi.

9    ALSO PRESENT:  Tricia Marcy, U.S. Probation Office.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          THE CLERK:  Court calls Criminal Action 21-10217,

3   United States v. Omoruyi.  Could counsel please identify

4   themselves and Probation.

5          MR. MARKHAM:  Christopher Markham for the government,

6   your Honor.

7          MR. HORSTMANN:  Good morning, your Honor.  Pete

8   Horstmann for Henry Omoruyi.

9          MR. TZENG:  Attorney Austin Tzeng.  Good morning, your

10:46 10  Honor.  With me is attorney Susan Costa for Osaretin Omoruyi.

11          MS. COSTA:  Good morning, your Honor.

12          MS. MARCY:  Good morning, your Honor.  Tricia Marcy

13   for U.S. Probation.

14          THE COURT:  All right, and you're filling in -- thank

15   you, thank you -- for Mr. Rinaldi?

16          MS. MARCY:  Yes.

17          THE COURT:  So I think the probation officer who had

18   been assigned to this Presentence Report is not available.  I

19   was thinking maybe he communicated with you all, but I wanted

10:46 20  to start with loss amount because we are doing a sentencing

21   today, and it's an unusually complicated sentencing.  So I

22   think that there are concerns I have about loss amount that

23   fall into two buckets, if you will.  One is with the alleged

24   co-conspirator who pled guilty before Judge Casper, Mr. -- I

25   think his name is Macpherson -- is that his name? -- and the

         1    other one is with respect to anything that predated the

         2    conspiracy that was charged, which began in 2019.  It wasn't

         3    clear from the Presentence Report what the dates of all these

         4    people were, and I was hoping that the probation officer would

         5    let you know that I was going to start with that.

         6              But before I even get to all those issues, there are a

         7    lot of issues of calculating the Guidelines, which I believe

         8    are identical with respect to both brothers.  And then I

         9    thought I'd split us up and start with one brother and then

10:47   10    move to the other brother because obviously I have to think

        11    about each person differently in sentencing.  Many of the

        12    issues were overarching that I thought we'd do it together to

        13    begin with.  Does that make sense to all of you?

        14              MR. MARKHAM:  Yes, your Honor.

        15              THE COURT:  In doing so, I found it very confusing on

        16    a lot of issues because the documents kept flowing in over the

        17    last three or four days, even over the weekend.  I have at

        18    least two briefs from Mr. Horstmann.  I have one brief from

        19    Mr. Tzeng.  I have two from you, Mr. Markham.  I have multiple

10:48   20    letters for both brothers, different letters, although the dad

        21    writes for both people, and I've got a separate letter for

        22    each.  And, in addition, I have I think three victim letters,

        23    but you think there are more?

        24              MR. MARKHAM:  Yes, your Honor, there are more.

        25              THE COURT:  There may have been more, but I don't know

1    who they are because for understandable reasons, their names

2    are blacked out, so I don't know if they're the ones I already

3    heard from on the stand.

4         MR. MARKHAM:  Yes, your Honor, in the government's

5    sentencing memorandum, it identifies some of the victims who

6    spoke, who testified; and then the victims who have initials on

7    their names, we're specifically using their initials because

8    they did not testify.

9         THE COURT:  Because the ones I got did not testify.

10:49 10   And were they from this other guy, or were they from these two

11   brothers?

12        MR. MARKHAM:  No, your Honor.  These are people who

13   sent money to these --

14        THE COURT:  To these accounts?

15        MR. MARKHAM:  For these accounts, yes.  I would note

16   that there is some overlap.  There are victims who sent money

17   both to these defendants and to Macpherson.

18        THE COURT:  I see.

19        MR. MARKHAM:  But I only know of one specific instance

10:49 20   of that off the top of my head.

21        THE COURT:  Okay.  So let me just start there.  I

22   don't feel -- Macpherson did not testify, right?

23        MR. MARKHAM:  No, your Honor.  He declined to

24   cooperate after pleading guilty to the conspiracy.

25        THE COURT:  Sure.  So he was in front of Judge Casper.

1    I feel like I don't know enough about him to count his money.

2    That said, when I did the calculation with Mr. Rinaldi, it

3    didn't bring it down below the range he was otherwise in.  I

4    think it was about $200,000?

5            MR. MARKHAM:  It was $203,206.53.

6            THE COURT:  Is Macpherson?

7            MR. MARKHAM:  Is Macpherson.

8            THE COURT:  Just uniquely him?

9            MR. MARKHAM:  Yes, your Honor.  He actually received

10:50 10   in his case over $600,000.  The government is only recommending

11   that that amount be counted toward this conspiracy for the

12   specific reasons I'm willing to address if you'd like to hear

13   them.

14           THE COURT:  No, I just didn't get -- I don't have

15   information, and you're not calling him to testify, right?

16           MR. MARKHAM:  Your Honor, if I could just put on the

17   record my reasons very briefly?

18           THE COURT:  Yes, you can, but I -- well, let me just

19   not assume that.  Are you calling any witnesses?

10:50 20           MR. MARKHAM:  No, your Honor.

21           THE COURT:  All right, go ahead.

22           MR. MARKHAM:  So Macpherson and these two defendants

23   were initially charged in the same complaint.  One pled guilty,

24   which is why he was not in the superseding indictment that went

25   before the jury in this case, but the government did

1   specifically allege in the indictment in this case that the

2   defendants conspired with each other and others, and Macpherson

3   was one of the "others" that was presented to the jury at

4   trial.  Two important pieces of evidence:  One, the Philip Weah

5   passport, the passport that was used to get this $203,000, that

6   was being stored in Henry Omoruyi's storage unit.  That passport

7   was entered into evidence at trial through the FBI agent who

8   searched that storage unit.  So that passport is being stored

9   in one of the defendants' storage units.

10:51 10       And then the other defendant, Osaretin Omoruyi, is

11  texting that Philip Weah passport and the bank account

12  information for Philip Weah over and over again to his same

13  overseas co-conspirators.  If I may, that was Exhibit 101 is a

14  summary of text messages sent and received by Osaretin.  He

15  received the Philip Weah bank information on eight separate

16  occasions.  Oh, sorry.  He received it on four separate

17  occasions, sent it on eight separate occasions, and in one of

18  those, he's actually negotiating the cut they're going to get.

19       So the Court is completely within its right, of

10:52 20  course, to use its discretion to not count it, but I'd ask that

21  you consider it as part of the sentencing, considering they

22  were charged together, one pled guilty to conspiring --

23       THE COURT:  Yes, but that was your choice.  The

24  charging decision is the government's choice.  I agree there's

25  some evidence, but I have to find it by a preponderance, and I

1    heard almost nothing about it in the trial.

2             MR. MARKHAM:  So, your Honor, I just want to make this

3    point.  At sentencing you don't only consider the trial --

4             THE COURT:  I understand, but usually I get someone to

5    testify, or I have more about it.  I didn't even recognize the

6    name Weah, so it was such a passing reference that I -- it

7    wasn't a big deal at the trial, I don't have any testimony, and

8    I am not counting it.

9             But it doesn't change the range.  This is what's

10:53 10   important here.  As far as we did the math, am I right about

11   that?  Did you get up to speed on this?  It didn't change the

12   range.

13            MR. MARKHAM:  It does not change the range, your

14   Honor, no.

15            THE COURT:  Now, the next thing is, because I didn't

16   have the dates on everything, were they all post-2019?

17            MR. MARKHAM:  Well, to be clear, your Honor, the

18   indictment didn't charge post-2019.  Your Honor cabined it to

19   that solely for the purpose of trial, but that's not how it was

10:53 20   charged.

21            THE COURT:  I thought the superseding indictment said

22   the conspiracy 2019 and later.

23            MR. MARKHAM:  It started at least starting in 2019,

24   and the government, just the same way we charge "or" and "and,"

25   we charge "starting in at least in 2019 --"

 1          THE COURT:  I know, but I'm not going to go back to

 2     2017.

 3          MR. MARKHAM:  But, your Honor, at a sentencing, under

 4     relevant conduct standard for continuing conspiracy --

 5          THE COURT:  I heard no evidence.

 6          MR. MARKHAM:  That's not true, your Honor.  You heard

 7     from Ping Yu who testified on that witness stand that she sent

 8     money to Osaretin Omoruyi in 2018.  She testified.

 9          THE COURT:  Well, let me just -- it was unclear from

10:54 10     the Presentence Report and from all of my evidence how much of

11     it was pre-2019.  I have to be able to make the judgment, not

12     you.  So how much of it was prior to 2019, which is the charged

13     date?

14          MR. MARKHAM:  So if your Honor is inclined to just cut

15     the conspiracy off at 2019 --

16          THE COURT:  Well, it could be December, 2018, but it

17     can't be all the way back to 2017.  There's got to be some

18     reasonable cutoff.  So I just want to understand.  I think

19     Mr. Rinaldi didn't know.  I called him yesterday to find out if

10:54 20     he knew.  He didn't.  It's not in here.  So I just want to

21     know, how much of it substantially predates 2019?

22          MR. MARKHAM:  I'm more than happy to give it to you,

23     your Honor.  I just want you to understand the reason the

24     government didn't put it in its briefing is because the

25     government didn't understand the Court's ruling as to cutting

1      off relevant conduct starting in 2018.

2            THE COURT:  It's not relevant unless it's within the

3      scope of -- I can't find relevant conduct foreseeable unless

4      it's within the scope of the conspiracy.  I forget what date.

5      I think it says "at least 2019," so I want to be able to make

6      my own judgments.

7            MR. MARKHAM:  I understand, your Honor.  So I brought

8      those numbers here if you'd like to hear them.

9            THE COURT:  Yes.

10:55 10            MR. MARKHAM:  So the Clifford Bernard bank account,

11     Henry Omoruyi's bank account, was the zero dollars before 2019.

12     So Clifford Bernard is zero.

13            THE COURT:  So you all got this message from

14     Mr. Rinaldi, right, because I asked him to send it, just so

15     this isn't a surprise to anyone?

16            MR. MARKHAM:  Your Honor, he didn't send me that

17     message, but I'm prepared to address it anyway.

18            THE COURT:  Oh, you didn't?  Did he not send it?

19            MR. MARKHAM:  Yes, he asked me if I had it, it might

10:55 20     be useful to bring.  He didn't say you wanted to start with it,

21     but, again, your Honor, I'm prepared.

22            THE COURT:  All right, all right, all right.

23            MR. MARKHAM:  So Clifford Bernard is zero dollars

24     before 2019.  Nelson Bright is zero dollars before 2019.

25     Philip Weah is also zero dollars, but my understanding is, your

1    Honor does not want to count that co-conspirator funds, which

2    just leaves us with just three accounts:  Henry's personal

3    account, Osaretin's personal account, and then Zion Cleaning.

4            So for Henry's personal account, $80,120.90 were sent

5    in 2018, so the year leading up to 2019.

6            In the Zion Cleaning account, which is the fake

7    company opened in the name of Osaretin Omoruyi --

8            THE COURT:  I heard a lot about Zion, yes.

9            MR. MARKHAM:  -- that received $36,726 in 2018.

10:56 10            And then the biggest chunk of money that comes before

11    2019 is in the Osaretin Omoruyi personal bank account, and that

12    is between 2016 and 2018, there's $314,251.30.

13            THE COURT:  So how much of that would just have been

14    in 2018?  Is it possible to --

15            MR. MARKHAM:  Because the FBI forensic analyst is in

16    back, if you give us --

17            THE COURT:  2016 is way too early.

18            MR. MARKHAM:  I understand, your Honor.  I could ask

19    if he could sort of do that math quickly.  I asked him for all

10:57 20    things that predated 2019.  I didn't have it broken out by

21    year, but we may be able to turn that around.

22            THE COURT:  So let me just -- maybe I'm now getting a

23    little confused.  So if we knock out Macpherson...

24            MR. MARKHAM:  Even if you knock out Macpherson, I

25    believe all of --

```
 1              THE COURT:  If I leave in 2018, does that...
 2              MR. MARKHAM:  So, your Honor, I could -- what we can
 3         try and do is, if we want to talk about --
 4              THE COURT:  Why don't we talk about the other ones and
 5         have him -- can you go talk to him?
 6              MR. MARKHAM:  May I just have a moment, your Honor?
 7              THE COURT:  Yeah, yeah, yeah.
 8              (Discussion between Mr. Markham and FBI agent off the
 9         record.)
10:58 10        MR. MARKHAM:  So, your Honor, it does sound like the
11         majority of it is actually for just the Osaretin account, which
12         is the only account that received money prior to 2018.  A lot
13         of it is from prior to 2018, so he's going to run and try to
14         get that number for how much came in in --
15              THE COURT:  And so I'm hoping -- poor Tricia Marcy
16         walked into the middle of this.  I'm just trying to do the math
17         because it may drop it down a level.
18              MR. MARKHAM:  Yes, your Honor, I think we're at over
19         $2 million.  If you drop out the Philip Weah and potentially
10:59 20   around $300,000, you're going to be right at about that
21         $1.55 million level, so it would potentially drop it down two
22         points, depending on what the answer is.
23              THE COURT:  I think it might.
24              MR. MARKHAM:  Yes, your Honor.
25              THE COURT:  So let's do a hold on that till the agent
```

1    returns.

2              MR. MARKHAM:  Yes, your Honor.

3              THE COURT:  And I want to make sure the defense has an

4    opportunity to look at the math because in fairness to you, the

5    issue of the pre-2019 was not raised until Mr. Horstmann raised

6    it yesterday midday, so this issue -- I didn't focus on the

7    pre-2019 till a late-filed memo, but now I'm focused, so I just

8    want to make sure the math is right.

9              So, now, let's go through the other enhancements and

11:00 10   circle back to that, if we can.

11             MR. TZENG:  Your Honor, I think, just to stay on this

12   point, the rough math that I've done I think is -- regarding

13   the original calculation of overall loss, the number is now

14   less by $655,000, approximately.

15             MR. MARKHAM:  That's not correct, your Honor.  We'll

16   get the math, but the numbers $2,094,000 and change, even if

17   you minus off $500,000 of that, it would still be over

18   $1.55 million.  So need to figure out the exact math, but even

19   if you take out the Philip Weah money and an entire $300,000,

11:00 20   that would still be over $1.55 million, but it's going to be

21   very close, so I need to get you that answer.

22             THE COURT:  Right.  So I'm now at the so-called "third

23   amended PSR," so I'm ignoring the earlier ones.  I hope you all

24   got that.

25             MR. MARKHAM:  Yes, your Honor.

1          THE COURT:  We're all playing catch-up here a little

2     bit, okay.  And the briefing was confusing because the briefing

3     was playing catch-up too a little bit on some of the issues.

4     So let me...  I believe they're identical, am I right, between

5     the two brothers?  So we start with the money laundering

6     Guideline, and one of the reasons is, the third PSR, that

7     starts it at a base offense level of 6.  I think that's

8     correct.  Then the question is whether or not it's over or

9     under $1.5 million.  But I think if I keep in 2018 -- I'm not

11:01 10     going to keep in 2016 and 2017, I don't think there's fair

11     notice of that -- the question is what the math would be.  I

12     don't know.  I don't know.  So we're going to do a hold on

13     that.

14          Ten or more victims, it strikes me if I count -- I do

15     believe there was a jury finding of a conspiracy between the

16     two brothers, so I think ten or more victims applies.  There

17     certainly were ten or more victims between the two brothers.

18          MR. TZENG:  For the record, and I might need my memory

19     refreshed on this point, but the jury did come back with a

11:02 20     question while they were deliberating as to whether or not they

21     needed to prove that the brothers conspired with each other,

22     and I believe that the Court's instruction to the jury was that

23     that was not a necessary finding; just one or more persons.  So

24     it's not -- I don't believe that the jury was required to make

25     a finding that they conspired with each other at all, which was

1     one of the bases that --

2          THE COURT:  Yes, but I'm finding that by a

3     preponderance.  So I do think there are ten or more victims,

4     and also...

5          MR. HORSTMANN:  Please note my objection, your Honor.

6          THE COURT:  Okay, I do.

7          MR. TZENG:  Mine as well, your Honor.

8          THE COURT:  I'm just going through the math right now,

9     okay?  So I don't know whether it's going to be plus 15 or plus

11:03 10     14.  That's what I don't know.

11          MR. TZENG:  Just note my objection on the number as

12     well.

13          THE COURT:  All right, okay.  Now, it still says here

14     a misrepresentation, the defendant acted on behalf of a

15     charitable.  As was pointed out by both defense memos, both of

16     the brothers were not the front men.  The people who made

17     representations were perhaps part of the conspiracy, but I

18     don't think I should charge either of these people with the

19     plus two.  They weren't the ones who made the misrepresentations.

11:03 20     I'm not sure they knew, you know, like these con men.  They

21     weren't the con men.

22          MR. MARKHAM:  Well, they were to the point --

23          THE COURT:  They weren't the ones interfacing with the

24     victims.  Put it that way.

25          MR. MARKHAM:  Yes, your Honor.  I mean, there's one

1   text from Osaretin where he's negotiating creating a fake

2   Facebook account so that his co-conspirator can specifically

3   hustle victims, which was presented at trial.  So I take your

4   point.  I think there's two distinct questions:  Did the

5   defendants know these were romance scams?  Absolutely, and I'd

6   like to be heard on that if you find --

7        THE COURT:  No, of course, I find that by a

8   preponderance they knew they were romance scams, but that's

9   different from whether someone was a soldier or in charitable

11:04 10   this, that, or the other.

11        MR. MARKHAM:  Correct, your Honor, there's no evidence

12   that they specifically told the victim "I'm a soldier" or "I'm

13   part of a charity."  I would note that under the Guidelines,

14   again, it's the Court's discretion to apply an enhancement, but

15   the question is whether the scheme involved that

16   misrepresentation.  And to the extent -- obviously it did in

17   this case, and, of course, you know, by a preponderance the

18   defendants knew --

19        THE COURT:  But there's no evidence that they could

11:05 20   have reasonably foreseen someone would say that they were a

21   soldier in Afghanistan.

22        MR. MARKHAM:  Well, your Honor, if I could be heard on

23   that, there is text messages where they're giving away address

24   information, specifically for Osaretin Omoruyi, and they're

25   talking about how they need to use the name "major," the rank

"major" on it.  There was also a text message from Danny
Omoruyi, another family member of theirs, who is sharing a
screenshot about where a victim is being tricked into sending
money to the United Nations to help medical personnel in
Afghanistan.  It's sent right to him.  So, again --

       THE COURT:  Sent to the brother?

       MR. MARKHAM:  Yes, to Osaretin Omoruyi, yes, your
Honor.  Danny Omoruyi sends a text message to Osaretin Omoruyi.
It's a screenshot that we presented at trial.  It was in one of
the exhibits.  And it's a woman who's being told, "Hey, send
this money to the United Nations so that these doctors can get
to Afghanistan."  The victim responds, "Where do I send money?"
It's then screen-shotted by Danny Omoruyi and sent to Osaretin.

       So, you know, whether you apply the two-point
enhancement I don't think is going to be determinative at the
end of the day of what their sentence is, but I just want to
make crystal clear for the record, the defendants knew what
this was.

       THE COURT:  Well, I find by a preponderance of the
evidence they knew they were romance scams.  They were mugus,
or whatever the word was.  They were fools, they were foolish
people.  But I do not think that they were personally involved
at all to the extent that the plus two was appropriate or -- I
don't remember that text.  You know, it was a long trial, but
it was maybe -- I certainly don't think it was true for both of

1    them, and I don't think it's enough to prove it, so I'm not

2    doing that plus two.

3        The plus two for located outside the United States, of

4    course it was.  All the money was shipped to Nigeria.  That was

5    proven beyond a reasonable doubt, not even by a preponderance,

6    so I give that plus two.

7        MR. HORSTMANN:  Can I be heard on that, your Honor?

8        THE COURT:  Yes.

9        MR. HORSTMANN:  I don't think it's that clear from

10   what's charged.  I think that the charges are very limited.

11   They're limited to bank fraud here in the U.S. --

12       THE COURT:  All these bank accounts shipping it to

13   Nigeria.  I think that was in the PSR.

14       MR. HORSTMANN:  That is in the PSR, and that's part of

15   the conduct, but it's consistent with our argument that you

16   should only include for Guideline calculation purposes those

17   amounts attributable to the victims, or in the extreme, those

18   amounts to the Clifford Bernard account.  The Clifford Bernard

19   account was opened on a particular day.  That's the bank fraud.

20   There's --

21       THE COURT:  But wasn't the money shipped after that?

22       MR. HORSTMANN:  There was money shipped to the Bank of

23   Nigeria, correct.

24       THE COURT:  Yes.

25       MR. HORSTMANN:  But it does not meet with the same

         1    criteria that we normally see for sophisticated means; and, in

         2    my view, this is a very unsophisticated transaction.  You know,

         3    to transfer -- to open an account in the name of Clifford

         4    Bernard and then transfer money to yourself as concealment, I

         5    consider that to be very unsophisticated, so for the record, we

         6    object.

         7         MR. MARKHAM:  If I can just be heard briefly and

         8    hopefully provide some clarity on the point, the same

         9    enhancement applies if it's sophisticated or if it involves

11:08  10    money overseas.

        11         THE COURT:  I agree with that.

        12         MR. MARKHAM:  So, yes, it was sophisticated based on

        13    the application note, but the Court need not even find that

        14    because on Page 7 of Exhibit 99 which was entered at trial, it

        15    shows that $550,000 was sent from Henry, Osaretin Omoruyi, to

        16    their personal bank accounts at the Bank of Nigeria, over half

        17    a million dollars.

        18         THE COURT:  Yes.  Why isn't that squarely within this

        19    enhancement?

11:08  20         MR. TZENG:  Just note my objection for the record.

        21         THE COURT:  All right, so I'm adding a plus two.  And,

        22    also, we did some research on this, and I do believe the

        23    authentication enhancement is properly given even though they

        24    were fake passports.  So --

        25         MR. HORSTMANN:  Please note our objection to that as

 1   well, your Honor.

 2          MR. TZENG:  Likewise, your Honor.

 3          THE COURT:  So just to do the math, let's say for a

 4   minute it's 6 plus 16 or 14 -- all right, so let's start with

 5   16 depending on where that goes -- plus 2 for ten or more

 6   victims, plus 2 for foreign jurisdiction/sophisticated means,

 7   plus 2 for authentication device.  So if it's at 16, that's 22,

 8   24, 26, 28; and if it's 14, it's 26.  So we just have to do the

 9   math on that, and I'm assuming we'll see your agent in a

11:09 10   minute.

 11          MR. MARKHAM:  I asked him to move swiftly.

 12          THE COURT:  Say it again?

 13          MR. MARKHAM:  I asked him to move swiftly, so

 14   hopefully he'll be back soon.  I asked him to move as fast as

 15   he can.

 16          THE COURT:  Well, maybe he doesn't have the information.

 17          MR. MARKHAM:  It's all in the bank records.  It's in a

 18   spread already.  It's just he doesn't have his computer.

 19          THE COURT:  I know, but here's the thing:  Have they

11:10 20   seen all these bank records?

 21          MR. MARKHAM:  Yes, your Honor.  They were all turned

 22   over in discovery.

 23          THE COURT:  Is there something you wanted to say?

 24          MR. HORSTMANN:  I just want to make sure my objection

 25   is clear to where we think the math comes out.  It's far below

16 your Honor.  We don't think the brothers should be
aggregated.  We don't think there should be any transactions
that are prior to the creation of the Clifford Bernard
accounts.  We don't think it should include money that the
government, not only the constitutional argument, hasn't proven
by putting witnesses on the stand and subject to cross-
examination.  But taking a name from a Korean bank account in a
case where Clifford Bernard is a fake account doesn't mean
anything to us.  That could be a fake name too.  To call these
people victims and attribute a monetary loss to them without
further proof of something, I mean --

THE COURT:  I thought these were all -- okay, stop me
if I'm wrong.  I thought I limited it.  I got rid of
Macpherson.  These are all moneys that flowed through your
client's accounts.

MR. HORSTMANN:  It did, your Honor, but there's no
proof at all that these people were real, as opposed to other
fake accounts.  Those were the names of the accounts.  We take
the government at their word for that.  But just because --

THE COURT:  I think it's more likely true than not
that they're real.

MR. HORSTMANN:  I understand that, your Honor, but I
just wanted to put our objection on the record.

THE COURT:  Why would someone unreal send the money
there?  I mean, it's --

1          MR. HORSTMANN:  Clifford Bernard.

2          THE COURT:  Well, that was phony from him.

3          MR. HORSTMANN:  Right, but, I mean, this is -- money

4     laundering is about moving money.  Just because somebody in

5     Korea has a bank account in their name and --

6          THE COURT:  I think that's speculative.  I have no

7     reason.  I saw these, like, eight women on the stand or

8     something like that, not to mention all the, which isn't

9     included for reasons I don't understand, the unemployment

11:12 10    compensation stuff.  I don't even know why that's not in there.

11          MR. HORSTMANN:  That's the point I was speaking about,

12     but --

13          THE COURT:  I don't understand why that wasn't added

14     in, but --

15          MR. MARKHAM:  Your Honor, the math is complicated

16     enough, and there's literally hundreds of these bank cards that

17     we'd have to get subpoenas.  Who knows if they have any money

18     on them?

19          THE COURT:  Anyway, I will take into account that

11:12 20    there was fraud, but I'm not adding it into loss amount and the

21     stuff from the COVID money.

22          But, anyway, let me just sort of -- this is either --

23     and it's I for criminal history, and then there's a question of

24     whether or not I vary downwards by two because they weren't

25     personally responsible for the fraud.

1          Did you want to say something?  I'm sorry.

2          MR. TZENG:  Yes, your Honor.  I do have a duty to

3     object contemporaneously on the same grounds that Mr. Horstmann

4     raised, but, also, more to the point -- I think it was in my

5     sentencing memo -- I tried to make the point that, look, I

6     mean, two of these bank accounts were created, Zion Cleaning

7     and the accounts in my client's name.  There's no issue that

8     there was bank fraud associated with the creation of those

9     accounts.  I mean, the Zion Cleaning business was opened up,

11:13 10   you know, nominally under Mr. Osaretin's name, but there was

11    nothing about the opening or creation of that account that was

12    fraudulent in terms of the bank.  So, therefore, the mere

13    listing by the government of moneys flowing through accounts

14    associated specifically in his name and the Zion Cleaning

15    accounts should not count for overall loss unless these people

16    testified in court.  There's just simply no evidence, the

17    government hasn't presented anything as to, you know, the

18    cavalcade of listed transactions of names and amounts.  The

19    fact of the matter is, for the vast majority of that amount of

11:14 20   money, we have absolutely no idea the circumstances --

21          THE COURT:  Well, do you have a basis for believing

22    that -- I mean, the money from those people flowed through the

23    accounts -- that there was a bona fide business reason for

24    that?

25          MR. TZENG:  It's not my burden to show, your Honor.

1          THE COURT:  I'm just saying, they flowed through phony

2    accounts.

3          MR. TZENG:  Not necessarily phony accounts if they're

4    in my client's name.  If they're in my client's name and under

5    the name of a business that he legitimately created, there was

6    paperwork submitted to the City of Boston regarding the

7    creation of a company named Zion Cleaning, and so the sheer --

8          THE COURT:  There was no Zion Cleaning, right?

9          MR. TZENG:  There was a legitimate business that was

11:14 10  established.  There was a certificate --

11          THE COURT:  I thought there wasn't one.  Am I

12    remembering that wrong?

13          MR. MARKHAM:  Your Honor, Zion Cleaning was a fake

14    business.  The defendant did not have a cleaning business.  And

15    the people who sent money to this account, some of whom you've

16    heard from, were just romance scam victims.

17          THE COURT:  But he's challenging that there was no

18    information in the PSR about that.

19          MR. MARKHAM:  Well, one, you heard, I believe Ping Yu

11:15 20  who you heard from sent money to the Zion Cleaning account, not

21    to mention the fact that just because you open up an account in

22    the name of Zion Cleaning, the fact that there is no evidence

23    that he ever worked for a cleaning company, and they never paid

24    taxes on any of this money, is alone enough to infer under

25    First Circuit precedent, which we put in our brief --

1          THE COURT:  Yes, I find by a preponderance of the

2     evidence that these were phony accounts.  There was no such

3     thing as Zion Cleaning as a sort of bona fide business, and

4     that the people who sent the money there were part of the

5     romance scam activities based on the testimony I heard.  So

6     your objection is preserved.  But regardless of whether it's 26

7     or 28, it's either 63 to 78 or 78 to 97.  Do I have the math

8     wrong?

9          MS. MARCY:  Excuse me.  So you calculated the base

11:15 10    offense level at 28 or 26.  There is an additional two-level

11    increase, which I don't think is objected to, for a conviction

12    under 18 U.S.C. 195- --

13          THE COURT:  All right, all right, good catch.  For

14    some reason, I didn't see that.  Maybe it was on a separate

15    page.

16          MS. MARCY:  So it's at 53 of Henry's PSR.  I don't

17    know if it's the same paragraph.

18          THE COURT:  Oh, there it is.  You're right, I missed

19    it.  You're right.  So we're either at 30 or 28.

11:16 20          MR. MARKHAM:  Your Honor, 28 would be 78 to 97 months

21    would be the Guideline sentence.

22          THE COURT:  Wait a minute.  I'm trying to mark these

23    down.  So it's either 30 or 28, Criminal History Category I,

24    but I'm going to be considering the two levels so we need to

25    discuss that, but let me just -- if it's 30, it's what?

1          MR. MARKHAM:  97 to 121 months.

2          THE COURT:  Yes.  And if it's 28, it's 78 to 97.

3          MR. MARKHAM:  Yes, your Honor.

4          THE COURT:  And, obviously, if the way the new

5     variance works or the new Guideline works, it's minus two, so

6     let me come back to that in a minute.  Supervised release

7     is...I don't think that changes.

8          MS. MARCY:  It does not change, your Honor.  It's two

9     to five years.

11:17 10          THE COURT:  The fine is?

11          MS. MARCY:  So the fine for a 30 would be $30,000 to

12     $300,000.

13          THE COURT:  Okay.

14          MS. MARCY:  And for a 28 would be $25,000 to $250,000.

15          THE COURT:  Now, in terms of restitution, as far as I

16     can tell, we should probably wait for another day for that,

17     unless you have an agreement on it.

18          MR. MARKHAM:  Your Honor, I think based on the

19     parameters that you've provided, we should be able to provide a

11:18 20     very short joint filing afterwards identifying what the

21     restitution number should be, obviously with the defense

22     preserving their objections, but I think you provided us

23     guidance on how you're calculating loss.

24          THE COURT:  Let's talk about the minus two variance.

25     As I read it, in order to get it, you have to not be personally

1  responsible, personally responsible; and neither of them were

2  personally responsible because they were the behind the scenes

3  set up the phony bank account, maybe rented the storage closet.

4  I think the minus two applies to them, first-time offender

5  types.

6  MR. MARKHAM:  Understood, your Honor.  I would just

7  note for the record that as of today, it doesn't apply at all,

8  but considering it will be applying tomorrow, that would be a

9  bit ridiculous of a position.

11:19 10  THE COURT:  I won't enter the judgment until tomorrow.

11  MR. MARKHAM:  Yes, your Honor.

12  MR. HORSTMANN:  Thank you, your Honor.

13  THE COURT:  So that's another variable there as to

14  where it's at, and I didn't know if we wanted to take a quick

15  recess to see where we were on the math or whether you just

16  wanted to go down a level.

17  MR. MARKHAM:  Yes, your Honor, it sounds like we're at

18  a 28 with the minus 2 for first-time offender with the

19  potential --

11:19 20  THE COURT:  Or a 28 or a 26.

21  MR. MARKHAM:  Or a 26, depending what the math is.  If

22  we could have a brief recess just to try to get you the right

23  answer, I'd appreciate it.

24  THE COURT:  And also confer with them because, really,

25  I didn't even think about pre-2019 till yesterday.

1           What time did you file your brief, Mr. Horstmann?

2           MR. HORSTMANN:  I think it was 1:00, your Honor.

3           THE COURT:  Yes, so --

4           MR. HORSTMANN:  But I was waiting for more.  In my

5    defense, I was waiting for more.

6           THE COURT:  Anyway, I'm here to do justice.  I'm not

7    going to ban it.  I'm just simply saying, I hadn't even focused

8    on that issue.  And Mr. Rinaldi didn't know the answer, and so

9    we got in touch with you as soon as I read it and understood

11:20 10   it.

11          So do you want to wait a couple of minutes?  And then

12   I was thinking of doing each person separately.

13          MR. MARKHAM:  Yes, your Honor, I think once we have

14   the Guideline sentencing range, the government would also

15   tailor its argument --

16          THE COURT:  All right, so just the Guidelines are --

17   it is true it says "at least 2019," but I'm not going to go

18   back to 2016 or 2017.  I don't think that gives fair notice, so

19   I will consider 2018.  And I will not consider Macpherson.  So

11:21 20  just maybe you can at least do the math and then preserve your

21   objections, both sides, for what I've done or I haven't done?

22          MR. MARKHAM:  Yes, your Honor.

23          THE COURT:  That might be worth doing.  Do you have

24   your cellphone on you?

25          MR. MARKHAM:  No, your Honor, but -- pardon me.  I

1    actually just received -- allow us to confer with defense.  I

2    just received an email from the FBI forensic analyst saying

3    that most of it is in 2018, meaning most of the money is coming

4    in in 2018; but I think the defense deserves more than an

5    email, so let us get him on the phone.

6             THE COURT:  He just walked in perhaps.

7             MR. MARKHAM:  So if we could allow defense to confer

8    with him and have a conversation --

9             THE COURT:  I completely agree.  So we'll take a

11:21 10    five-minute hiatus or break?

11            MR. TZENG:  Before we adjourn, your Honor, just a

12    couple things.  Number one, in my sentencing memo, I did

13    discuss the idea that Macpherson Osemwegie's indictment

14    indicates a conspiracy that existed in 2017, and on that basis,

15    my client should not be responsible for the loss.

16            Now, Mr. Horstmann thankfully drilled down on that and

17    hit the nail on the head.

18            The second issue is, and I raised this in my PSR

19    objections --

11:22 20            THE COURT:  Well, you did raise Macpherson.  I think

21    everyone raised Macpherson, but I didn't understand that even

22    if we drill him out, some of the other moneys came in.

23            MR. TZENG:  Right.  I just indicated that, you know,

24    the charged indictment did not indicate some time period prior

25    to 2019.

 1          THE COURT:  Well, didn't it say "at least 2019"?

 2          MR. TZENG:  It did.

 3          MR. MARKHAM:  I'd also note the original complaint in

 4   this case was back in 2018, so there's no issue of fair notice.

 5   It was a trial superseding indictment.

 6          THE COURT:  I go by the indictment.

 7          MR. MARKHAM:  Understood, your Honor.

 8          MR. TZENG:  The other thing, your Honor, and I raised

 9   this issue in my sentencing memo as well as my PSR objections,

11:22 10   that it's the defendant's contention that he should be eligible

11   for a minimal or a minor role deduction --

12          THE COURT:  You're right, you did raise that.

13          MR. TZENG:  -- in the overall conspiracy.  You know,

14   this is a situation where the vast majority of the legwork is

15   being done by others, not Osaretin Omoruyi, there being no

16   allegation whatsoever that he had communication or contact with

17   any particular witness or alleged victim in the case.  So I

18   think that the mere opening of bank accounts -- and this would

19   have been my argument with respect to sophisticated means had

11:23 20   that enhancement applied -- but the mere opening of bank

21   accounts pales in comparison to the type of scam, defrauding

22   that are done by the front-end people.

23          Now, even if the Court were to take into account that

24   Mr. Osaretin Omoruyi was responsible for the opening of the

25   Nelson Bright account, which I'm not sure that it necessarily

1    is, that passport existed in Osaretin Omoruyi's house, but it

2    does not necessarily mean that he is the person who opened the

3    account.  The Court heard evidence in the course of the trial

4    that persons other than Osaretin Omoruyi were making

5    transactions on the account.  Those were the drive-through ATMs

6    on the Nelson Bright account at the Citizens Bank.  I asked the

7    witness straight up, who is this?  And there were women

8    involved.  There were people that were clearly not Osaretin

9    Omoruyi.  So minimal minor participant I think he should be

11:24 10    eligible for.

11           Also, the fact that there were other people who had

12    access to the account also leads into my argument regarding

13    overall loss, that he shouldn't necessarily be held accountable

14    for transactions that were or could have been made by others.

15           Thank you.

16           MR. HORSTMANN:  Your Honor, I made the same argument,

17    I'm not going to repeat it, but I would join in that.

18           THE COURT:  Okay, thank you.  I decline to afford a

19    minor role reduction.  I think he opened the accounts and he

11:25 20    had the storage closet, so --

21           MR. TZENG:  Just for the record, none of the items

22    belonging to Osaretin Omoruyi were found in the Prime Storage

23    facility.

24           THE COURT:  That's fair, that's with respect to Henry;

25    and with respect to Osaretin, he did have some stuff but --I

```
 1    forget the address now but --

 2            MR. MARKHAM:  There's a storage unit actually, your

 3    Honor, in the basement of their home which had essentially the

 4    same --

 5            THE COURT:  Kind of stuff.

 6            MR. MARKHAM:  -- implements of fraud that you saw.

 7            THE COURT:  I think that's right, but the big issue

 8    was the opening of the accounts, and I don't think that's a

 9    minor role because so much flowed through.  But neither am I

10    making them supervisors, and neither do I feel they were

11    directly responsible for some of these misrepresentations to

12    the romance scam, the people who were scammed.  I mean, they

13    were basically, I don't know, people who got the money and then

14    forwarded it to Nigeria, essentially.

15            Okay, we'll take a few-minutes break, okay?

16            MR. MARKHAM:  Thank you, your Honor.

17            THE COURT:  And then I thought maybe what I would do

18    is -- I notice people are here, and I don't know if they're

19    family members.  So I don't know if they're family members of

20    both of them or neither of them, so there it is.  Thank you.

21            THE CLERK:  All rise.

22            (A recess was taken, 11:26 a.m.)

23            (Resumed, 11:39 a.m.)

24            THE COURT:  Okay, so what does the math look like?

25            MR. MARKHAM:  Yes, your Honor, the defense and the
```

1    government agree that excluding 2016 and excluding 2017 and

2    excluding the Macpherson accounts, the reduction would only be

3    $250,000 in total, approximately.

4            THE COURT:  So it leaves --

5            MR. MARKHAM:  It leaves about $1.75 million or

6    slightly more, which is well above where the Guideline cutoff

7    is.

8            MR. TZENG:  Your Honor, I agree that's the current

9    calculation.  I just want to be clear here that I still

11:40  10    maintain my objections, all of the objections regarding the

11    calculation of loss that I raised previously.

12            THE COURT:  And just so I can see, if I reduced it to

13    2018, it would just skip below?

14            MR. MARKHAM:  No, your Honor, I'm not quite sure

15    that's right.  It would literally be right on the line.

16            THE COURT:  Okay, thank you.

17            MR. HORSTMANN:  Which Judge Woodlock would call a

18    straddle calculation, which he might, you know, lead the way.

19            THE COURT:  Okay.  At least for right now, though, it

11:41  20    would be Total Offense Level 30, right?

21            MS. MARCY:  Yes, your Honor.

22            THE COURT:  Criminal History Category I.  When I bring

23    it down to 28 because of the variance -- am I right about doing

24    this? -- this is how the math works -- then that brings it to

25    28 and I, which brings us to 78 to 97, something like that,

right?

     MR. MARKHAM:  Yes, your Honor, exactly that.

     THE COURT:  Okay.

     MR. MARKHAM:  Including the variance.

     THE COURT:  Which when I issue the judgment tomorrow will be the law.

     Okay, so it's Total Offense Level 28, Criminal History Category I, 78 to 97 months, two to five years, $30,000 to $300,000.

     MS. MARCY:  Excuse me, your Honor.  It's actually going to drop down about two levels to 25.

     THE COURT:  All right, it's the $25,000 to $250,000, okay.

     Now, no counts carry a mandatory minimum.  I have not accepted the Presentence Report with respect to some of the enhancements and I have with respect to other of the enhancements.  I believe both brothers are treated the same in terms of the Guidelines.  And what I thought I would do -- and I don't have a strong view as to who goes first and who goes second -- is only do one at a time and have the others stay back there until I have ruled, but of course the lawyers can stay here.  I don't think there's any other law that's crosscutting.  Is that right?

     MR. MARKHAM:  No, your Honor, not --

     THE COURT:  All right, so who wants to go first?

1          MR. HORSTMANN:  I'm happy to, your Honor.

2          THE COURT:  All right, so why don't I have Osaretin

3     Omoruyi just go back there.  His family of course can stay.

4     His lawyers of course can stay.  There's nothing secret about

5     this, but I don't want it to be -- I want it to be

6     individualized, let's just put it that way, and I want when

7     people speak to be able to speak.

8          MR. TZENG:  Well, my only concern about that, your

9     Honor -- and I've seen Judge Wolf have the government group two

11:43 10    defendants at a time in a multi-person financial fraud

11    conspiracy, you know, defendants that were similarly

12    situated -- I just don't want it to be an issue, if the Court

13    has already heard from Mr. Horstmann but it's a point that I

14    would have raised anyways with respect to my client, I just

15    don't want him to think, you know, "Mr. Tzeng, why aren't you

16    raising these issues?"  But I don't want to belabor the point,

17    but I also don't want to be duplicative of similar arguments

18    that Mr. Horstmann might make.

19          THE COURT:  Okay.  I just think in general, when he

11:44 20    gives his statement and I think about him, sometimes people

21    feel -- I mean, especially when they're brothers, it's

22    emotional -- if I sentence, for example -- I haven't decided

23    what the sentences are differently with respect to each of

24    them -- I think we should just proceed this way.

25          MR. TZENG:  Understood.  Thank you.

```
 1              THE COURT:  I haven't made any decisions at all.  I'm
 2     just --
 3              MR. HORSTMANN:  I don't expect my client to make a
 4     statement, your Honor, just so you know.
 5              THE COURT:  Well, that would be the other thing,
 6     people making statements.
 7              Okay, so the government.  Now, I assume, do we have
 8     any victims here who are speaking?
 9              MR. MARKHAM:  No, your Honor, only the victim impact
10     statements submitted to the Court.
11              THE COURT:  All right, go ahead.
12              MR. MARKHAM:  So the Court has calculated the
13     Guidelines now and varied below those Guidelines, resulting
14     in --
15              THE COURT:  At this point, I don't even really
16     consider it a variance at this point.
17              MR. MARKHAM:  Understood, your Honor.  It's just that
18     it's just technically what it is.
19              THE COURT:  I don't know.  If I enter the judgment
20     tomorrow, is it?
21              MR. MARKHAM:  I think it doesn't go into effect until
22     February technically.  Congress has until tomorrow to reject
23     it, which --
24              THE COURT:  Oh, it doesn't go in effect until
25     February?
```

1          MS. MARCY:  So I think that technically it's the

2     Guideline manual in effect on the day of sentencing, so the day

3     of sentencing is today, so that would still be the 2021 manual.

4          THE COURT:  Oh, I see.

5          MS. MARCY:  I know, it seems, like, silly but --

6          THE COURT:  It does seem silly, doesn't it?

7          MR. TZENG:  So just to clarify, my understanding is

8     that the new Guideline is supposed to kick in tomorrow.

9          THE COURT:  That's what I thought.

11:45 10          MR. TZENG:  But the retroactivity to the persons who

11     have already been sentenced, to which the zero-point offender

12     should apply, does not kick in until February 1st of next year.

13     That's my understanding.  So even though the rule is supposed

14     to go into effect tomorrow, the retroactivity of it does not --

15          THE COURT:  Yes, but since the judgment won't enter

16     till tomorrow, not actually even because of this, just because

17     it will take me that long to get it all together, I think that

18     it will be in effect.

19          MR. TZENG:  Thank you, your Honor.

11:46 20          THE COURT:  Anyway, all right, go ahead.

21          MR. MARKHAM:  Yes, your Honor, and I think it's a

22     distinction without a difference because we're here to talk

23     about the conduct.

24          THE COURT:  Yes.

25          MR. MARKHAM:  Not just the numbers.  For instance,

1    we've applied a zero-point, essentially a zero-point offender

2    reduction, despite the fact that this is a crime that lasted

3    for over two years.  It was from 22 different bank accounts.

4    Over a hundred people transferred money into these accounts.

5    And so there's a question of whether it even makes sense to

6    apply something that's meant for a first-time offender who made

7    one mistake to a multiyear conspiracy that's like this.  But

8    that's not the point.  The point is to come here now and talk

9    about what did the defendants actually do, what did they know,

11:46 10   and what the sentence should be, so allow me to do that.

11         The government is asking for a Guideline sentence in

12   this case, even taking into account the Court's Guidelines

13   calculation, so something between 78 and 97 months; and the

14   government's position is that it should be something on the

15   higher end of that Guidelines calculation.

16         So why is the government asking for something on the

17   higher end of the Guideline calculation?  Well, first, it's

18   important to note that Guideline sentences, even in money

19   laundering cases, where the defendants claim that they didn't

11:47 20   talk to the actual victims are not uncommon.  The government

21   provided one example recently from this district, *United States*

22   *v. Abbas*, where Judge Sorokin sentenced a money launderer, who

23   was laundering money for overseas fraudsters, to a Guideline

24   sentence of 108 months, in recognition of that person's role in

25   the scheme over the course of an extended period of time which

1    is serious.

2          In this particular case, a sentence within the

3    Guidelines at the higher end is appropriate because of the

4    particular facts before this Court with respect to these

5    defendants.  I believe the government has probably overbriefed

6    you at this point on this case, and you've seen the entire

7    trial, so I'm not going to go through everything you saw and

8    heard, but I'd like to highlight four key points that the

9    government would like you to consider.

11:48  10          First, unlike most fraud cases, this case involves

11    real harm to individual victims, and the defendants knew that

12    that was what was happening.  We've seen Henry's text message

13    to Osaretin about their friends being arrested specifically

14    for, quote, "romance scams."  You know that a co-conspirator

15    described the victims to Osaretin Omoruyi, the other defendant

16    in the case, as "mugus," which translates to the idiots or the

17    fools.  And Osaretin then went on to open a fake Facebook

18    account so that that defendant could hustle, and we know that

19    Henry when he's sending that text message to Osaretin, Osaretin

11:48  20    is talking to his co-conspirators overseas, that Henry and

21    Osaretin were in a single conspiracy.  They're brothers who

22    live with each other, who are doing this over the course of

23    years.  Of course they're talking to each other about what

24    they're doing, as you saw in their texts with each other.

25          In most money laundering cases, the defendants come to

1   sentencing, and they can plausibly claim, particularly in cases

2   like this, that they had no idea what the money was for.  They

3   do essentially what these defendants have done, including Henry

4   in his sentencing memo, which is to say, "I just opened

5   accounts through which money flowed," this passive voice, as if

6   they did nothing wrong or had no agency in the matter.  But you

7   know that's not true in this case because Henry texted his

8   brother about their own friends, who were doing the exact same

9   thing in the Boston area, being arrested for romance scams.

11:49  10        And the amount of pain and harm that caused to the

11   real victims, you know what that is.  You've seen some of them

12   testify.  It's heartbreaking.  You've heard their victim impact

13   statements.  They lose trust in society as a whole, they lose

14   trust in themselves, and, yes, they lose a ton of money,

15   leaving some of them only scraping by to survive.  They used

16   words like "fear, embarrassment" and "shame," and all that pain

17   and the defendants' knowledge of that pain merits a Guideline

18   sentence, just a sentence within the Guidelines calculated by

19   Congress.

11:50  20        Second, despite the clear evidence of the defendants'

21   guilt and their knowledge, they still refuse to accept any

22   responsibility or express any remorse.  I read their sentencing

23   memoranda carefully, including Henry's.  He says he had "no

24   knowledge of the purpose of opening fake accounts."  Your

25   Honor, you know that's not true.  You know he had knowledge of

the purpose of opening fake accounts.  Mike Amiegbe testified

that he spoke to Henry directly in person about these scams and

how they're opening fake accounts.

THE COURT:  And was he the one who did the unemployment

compensation, the Green Dot cards?

MR. MARKHAM:  Yes, your Honor.  He's the one who

described meeting Henry in person, and they had a nickname.

They were doing so much unemployment fraud that they called it

"pandy."  That's the nickname they had for it, and that's

pandemic, as in pandemic unemployment fraud.

THE COURT:  But it was he and not Osaretin, right?

MR. MARKHAM:  So Mike Amiegbe only testified about

speaking to Henry, correct.  He did not testify about speaking

to Osaretin.

THE COURT:  So to some extent, although it wasn't

included in loss amount, do we know at least some amount that

was stolen or not?

MR. MARKHAM:  So, your Honor, there are amounts, about

$15,000 that were deposited directly into the defendants' bank

accounts, about half in each from unemployment; but the

majority of unemployment, as you saw, was actually coming in

those bank cards, the hundreds that we found in Henry's storage

unit in the names of other people.  And that's why the

government put in its sentencing memo that its loss calculation

is reasonable and also conservative, because we're just never

1    going to know on those hundreds of cards how much money

2    potentially went into them.  It's why the government didn't

3    include it in its loss amount, because it can't give you a

4    reasonable figure, but we know the figure we provided you is

5    really on the conservative end.  It doesn't include those

6    hundreds --

7            THE COURT:  But it was Henry, not Osaretin?

8            MR. MARKHAM:  So there were bank cards both in

9    Osaretin's storage unit in the house where Osaretin had some of

11:52 10    his materials, his passports, and there were also those bank

11    cards in Henry's.  There were more in Henry's, though.  And as

12    you saw at trial, it's in the PSR, the pictures of all those

13    bank cards in Henry's storage unit, including bank cards with

14    individual people's name on it that says "Arizona unemployment."

15    It's clear what it is.  It's clear it's in someone else's name.

16    But, no, we don't know how much money was sent or attempted to

17    be sent to all those cards or how much was withdrawn.

18            So --

19            THE COURT:  The one gentleman who testified, where did

11:52 20    that money go?

21            MR. MARKHAM:  Pardon me, your Honor?

22            THE COURT:  There was one guy who testified.  He was a

23    nurse.

24            MR. MARKHAM:  Yes, your Honor, that was Bruce Rioux.

25            THE COURT:  Do you remember?  It just wasn't

1  something -- I remembered it from the trial and was surprised

2  that so little of it came of issue in the PSR.

3        MR. MARKHAM:  Yes, your Honor, Bruce Rioux was a nurse

4  in Maine and --

5        THE COURT:  Someone stole his pandemic money, right?

6        MR. MARKHAM:  Yes, your Honor.  I believe it went to

7  the Clifford Bernard account.  Is that correct?

8        MR. HORSTMANN:  It did go to the Clifford Bernard

9  account, but it was never his money.  I think he testified that

11:53 10  he didn't even put in an application.  Just somebody used his

11  identity.

12        THE COURT:  I see, I see.

13        MR. MARKHAM:  Yes, your Honor, he wasn't unemployed.

14  He was actually a nurse during the pandemic working overtime

15  while this scheme was stealing money from U.S. taxpayers.  So

16  while he was impacted in that his identity was stolen, it

17  wasn't his unemployment that was somehow rerouted.

18        So you know that Henry had knowledge of the purpose of

19  opening these accounts.  To claim otherwise just isn't

11:54 20  reasonable.  Henry texted about his friends being arrested for

21  romance scams and identity theft, and he even rented a storage

22  unit where he hid multiple fake passports and allowed his

23  co-conspirators to hide their multiple fake passports.

24        Henry also claimed in his sentencing memoranda that

25  this conduct was aberrant behavior, and this gets to the point

1    I made earlier about how long the scheme went on.  It can't be

2    aberrant behavior when it's what you do for a living for two

3    years.  That's not aberrant behavior.  That's what you do.

4    That's the choices you decided to make about how to live your

5    life in order to get hundreds of thousands of dollars for

6    yourself.

7         And notably, this only stopped when they got arrested.

8    It's not like this stopped when the government found out about

9    it way later.  Their friends were arrested in 2020.  That's

11:54 10    when they sent those messages about their friends being

11    arrested for romance scams, and they kept doing it for nine

12    more months after that, only stopping when the handcuffs got

13    put on them.  So this isn't aberrant behavior.  It's what they

14    decided to do.  And under those circumstances, Henry's refusal

15    to really accept any responsibility, to try to use the passive

16    voice about opening bank accounts and say he didn't really know

17    what it was for, that merits a higher, on the higher end of a

18    Guideline sentence.

19         Third, unlike in most fraud case that come before you,

11:55 20    these defendants are going to be able to keep essentially their

21    profits from this scheme.  You know the defendants were getting

22    a substantial cut of the proceeds.  Mike Amiegbe testified

23    about it.  You've seen their texts discussing a 30 percent cut,

24    and the defendants then transferred their cut, that 30 percent,

25    overseas.  The bank records -- this is Exhibit 99 -- and

testimony from Mr. Harger showed that between 2019 and 2021,
Henry and Osaretin combined transferred over $550,000 to their
personal bank accounts in Nigeria.

So two things about that:  One, that is an
astronomical amount of money in Nigeria where the cost of
living is so much lower, which is important to consider about
the defendants' benefit from their scheme, is relatively how
much that money is worth there.

The second thing to think about is, that amount makes
perfect sense because you've calculated the loss as about
$1,750,000, approximately.  $550,000 is about one-third of that
loss, the exact amount that they were negotiating in their text
messages.  So you know what that money is for:  It's their cut.
It's going to their personal bank accounts in Nigeria.

You also saw what the defendants were able to buy with
that in the bank records.  You see various memo lines, albeit
more of them are for Osaretin, but some of them also with Henry
where it says on the memo line to their personal bank accounts
in Nigeria that the money is for real estate.  And on
Osaretin's phone, which is in the PSR, these pictures, you see
this.  You see --

THE COURT:  I know those pictures.

MR. MARKHAM:  Okay, your Honor.  Well, I think it's
just important to remember that they were never going to pay
any of this money back, never.  They've sent it over to

1    Nigeria.  You're going to give a restitution order and

2    forfeiture order?  They're never going to pay it back.  It's in

3    Nigeria.  It's going to be waiting for them when they get out

4    of prison.

5         And that's where in a fraud case, usually people who

6    come before you are U.S.-based people who you're going to

7    garnish their wages; you're maybe going to take their house for

8    some major fraud.  That's not going to happen here.  This is

9    the rare case where you're looking at someone who has been

11:57 10   convicted at trial, and you have to decide what the punishment

11   should be for someone who gets to keep the money after

12   committing the fraud.  And the reason you know they're never

13   going to just out of the kindness of their heart repatriate the

14   money is because they were arrested in 2021.  They've been in

15   jail for three months.  Not a penny has been repatriated

16   because they don't want to do it.  It's in the Omoruyi

17   apartments.  It's in the Osaretin Omoruyi mansion that's being

18   built.

19         So what sort of sentence do you have to craft for

11:58 20   people who get to keep the money?  It's got to be something on

21   the higher end of the Guidelines because that's just so rare in

22   a fraud case.

23         THE COURT:  Do you draw any distinction between the

24   two brothers?

25         MR. MARKHAM:  I think it cuts both ways, your Honor.

```
 1    I think if you look, they were working the conspiracy, of
 2    course.  Osaretin did get slightly more money flowing through
 3    his accounts, and we see his accounts -- I know you're not
 4    considering it -- but going back to 2016.  So it does look like
 5    he was starting this earlier based on what we were able to see.
 6    And because we have Osaretin's phone, we do have more instances,
 7    I mean, hundreds of instances with his text messages with
 8    overseas co-conspirators.
 9              Now, some of those text messages are with Henry, so we
10    can see them working together.  And a lot of those text
11    messages are Osaretin moving Henry's fake identity to those
12    overseas co-conspirators, so we know this is a single
13    conspiracy.  But the fact remains, under 2B1.1, you're supposed
14    to consider loss amount in terms of what their culpability is,
15    and several hundred thousand more dollars did go into
16    Osaretin's accounts.
17              Now, it cuts the other way based on the facts of the
18    case which you have seen, which is that, one, Henry had the
19    storage unit where he allowed other co-conspirators to
20    essentially fill up all their fraudulent bank cards and fake
21    passports there.  He is the one who rented that and allowed
22    other people to use it.
23              And, by the way, when the government calculates loss
24    amount, we're not including Macpherson Osemwegie who was
25    storing his fake passports there.  We're not including Amowie,
```

1   the other co-conspirator who stored his fake passports there,

2   so that's a conservative loss calculation under those

3   circumstances.  But, nevertheless, Henry made that decision to

4   basically create a storage unit so other people he knew could

5   commit the same crimes.

6           And, secondly, for the reasons the Court well knows

7   because it ordered a GPS bracelet on Henry prior to trial, he

8   did release the names of witnesses prior to trial, including

9   one whose family members were subsequently threatened in

12:00 10   Nigeria because he was talking, and then that person didn't

11   ultimately testify at trial.  We have no evidence that

12   Osaretin --

13           THE COURT:  Did or did not?

14           MR. MARKHAM:  He did not testify at trial.  So the

15   government had two essentially cooperators on its witness list.

16   You only heard from one of them.  The other one did not testify

17   at trial, and that's the one who's reported having his family

18   members threatened in Nigeria after his name was released.  So

19   that's how it sort of cuts both ways.  It appears Henry is

12:00 20   working --

21           THE COURT:  And you don't have any knowledge that one

22   was more involved than the other in an unemployment compensation

23   scam?

24           MR. MARKHAM:  No, your Honor.  I mean, Henry's storage

25   unit has more of those bank cards, but at the same time, he has

1    other co-conspirators who he was letting use that are storage

2    unit, so it's hard to parse out how many of those bank cards

3    were definitely his versus co-conspirators.

4        Now, in our view of what the scheme is, it doesn't

5    really matter.  They're all working together to do this, and

6    there's hundreds of bank cards, but that's why the government

7    wants to be a little careful in sort of ascribing all of those

8    bank cards to Henry.

9        THE COURT:  And what about Macpherson, who got a

12:01 10  substantially lower sentence before Judge Casper?

11        MR. MARKHAM:  Yes, your Honor, one is, his Guidelines

12    were far lower.  The amount of money was far lower.  He pled

13    guilty and accepted responsibility.  So I just think they're in

14    two totally different worlds, you know, between the Guidelines

15    and accepting responsibility.  Also --

16        THE COURT:  It's a minus three, but I didn't know

17    whether that accounted for the whole difference.

18        MR. MARKHAM:  So, no.  I mean, the amount of money

19    flowing through his accounts is far less.  As you saw in the

12:01 20  Philip Weah account which we subtracted, it was $200,000.

21        THE COURT:  All right, so that's the reason.

22        MR. MARKHAM:  Yes, your Honor, and I also think in

23    pointing out all the other sentences I'm talking about, which

24    is, you know, before Judge Casper is not evidence that

25    Macpherson knew these were romance scams.

         1          THE COURT:  I know almost nothing about him, which is

         2     why I didn't include the money.

         3          MR. MARKHAM:  Yes, your Honor, but these are the

         4     distinctions I'm trying to make here of why --

         5          THE COURT:  No, I understand.

         6          MR. MARKHAM:  -- these are the higher end of the

         7     Guidelines, being able to keep the proceeds from the fraud

         8     afterwards by sending it oversees.  Seeing their internal text

         9     messages, we know that they know what these are, I think makes

12:02   10     a huge difference, along with the different Guidelines

        11     calculations, of course, which gets me to my last point, which

        12     is general deterrence, particularly in light of the fact the

        13     defendants are going to be keeping a lot of this money.

        14          General deterrence in this case is far more important

        15     than in your typical fraud case.  The sentencing is not just

        16     about holding these defendants accountable, which it should be

        17     and the focus should be on these defendants, but the First

        18     Circuit has made clear over and over again that particularly in

        19     fraud cases, they are prime candidates for consideration of

12:03   20     general deterrence because these are the sorts of crimes that

        21     are far more cool, far more calculated.  The defendants over

        22     the course of years are making a cost/benefit analysis, like,

        23     "What is this money worth to me compared to the potential jail

        24     time I could actually get?"  They're making that analysis.

        25     They know if they get caught, they're definitely going to be

1  deported and that they're going to be facing some jail time,

2  and there the question is, "How much money can I get, and how

3  much does it cost on the other end in potentially jail time?"

4  which is why general deterrence is so important in this case.

5  　　　　The Court's sentence can help bend that cost analysis

6  toward the right way, toward the way of convincing people that

7  when they see what the sentence was in this case, "I don't want

8  to be part of that," because let's be clear, and we all know

9  this to be true -- this is probably not the first case you've

12:03 10  seen like this, your Honor -- fraudsters in Nigeria are not

11  going to stop targeting U.S.-based victims, and the U.S.

12  government can't force them to stop targeting U.S.-based

13  victims.

14  　　　　But you also know that those crimes, those frauds and

15  U.S.-based victims, are impossible to accomplish without U.S.-

16  based co-conspirators who are willing to open up the bank

17  accounts.  You cannot have the scheme without both ends of the

18  spectrum.  If you stopped the money launderers in the United

19  States, you'd functionally stop this fraud from happening,

12:04 20  because you met some of these victims; they're not going to

21  send money to Nigeria.  They'll only send it to a U.S.-based

22  bank account opened up in the name of a fake person who they

23  think they're talking to.  That is the romance scam, not to

24  mention the unemployment fraud, which also is not going to be

25  deposited into a Nigerian bank account.  They need the

1    U.S.-based bank accounts.

2         THE COURT:  Thank you.

3         MR. MARKHAM:  The last point I'd make is just that

4    general deterrence in this case is not a hypothetical exercise,

5    unlike other cases, just because you've seen their text

6    messages with each other.  I mean, Henry literally sent a

7    screenshot of a Massachusetts U.S. Attorney's Office press

8    release about his friends being arrested who were doing the

9    exact same thing and then kept doing it for nine months.  So I

12:05 10   do think you're in a unique place here to go to the higher end

11   of the Guidelines because you know that they talk about who's

12   being prosecuted, you know they talk about what happens in

13   these cases, and you know this case is both cruel and

14   calculated.

15        And for all these reasons, your Honor, the government

16   would ask for a sentence at the higher end of the Guideline

17   range for Henry Omoruyi.  Thank you.

18        THE COURT:  Thank you.

19        MR. HORSTMANN:  Thank you, your Honor.  I'd like to

12:05 20   start by just advising the Court that we're requesting yet

21   another amendment to the PSR that includes recent medical

22   history for Henry.  He was actually hospitalized over the

23   weekend and had to get an I.V. antibiotic for an infection that

24   he's dealing with.  So if the Court is inclined to sentence him

25   to a term of incarceration, we're asking that it be --

```
 1              THE COURT:  I don't understand.  What did --
 2              MR. HORSTMANN:  He wound up in the hospital Friday
 3     night, your Honor, with a --
 4              THE COURT:  For what?
 5              MR. HORSTMANN:  -- really bad cysts that became
 6     infected and --
 7              THE COURT:  Sepsis or --
 8              MR. HORSTMANN:  I haven't looked at all the medical
 9     records.  I don't have them.  He doesn't have them.
12:06 10         THE COURT:  Is it over with?
 11             MR. HORSTMANN:  No, it's not.  He's still receiving
 12    antibiotics, so we're requesting --
 13             THE COURT:  I just don't know if it's temporal or
 14    whether it's something that a medical facility would have to
 15    know about.
 16             MR. HORSTMANN:  It's been going on for a while.  He
 17    just hasn't been receiving the kind of medical treatment that
 18    he needed at Wyatt --
 19             THE COURT:  I see.
12:06 20         MR. HORSTMANN:  -- and they hospitalized him.  Anyway,
 21    we're requesting Devens if the Court is inclined to sentence
 22    him.
 23             THE COURT:  Well, I don't have a problem.  I mean, I
 24    want him to be -- he's just not going to be assigned for three
 25    weeks, so I don't know if it's something that -- you know,
```

1    like, we've all had infections that we had to take antibiotics

2    for.  Is it something where he needs a medical facility or not?

3    I'll leave it up to -- how would you like to handle it?

4         MS. MARCY:  I do think it makes sense to add this to

5    the PSR so they can consider it.

6         THE COURT:  Okay, so that they consider whether it's

7    temporary or not, but let's not -- I don't have a problem with

8    adding it.  I just want to make sure it's not something that --

9    I don't know that I'll make a recommendation to a medical

12:07 10   center if it's a short-term thing.  I'm sorry it happened.  I

11   don't know, but we'll add it to the PSR.

12        MR. HORSTMANN:  When we have the records, we can make

13   a better decision, I guess.  So --

14        MS. MARCY:  I'm sorry, your Honor.  I have the

15   records, and the diagnosis is cellulitis.

16        THE COURT:  Okay, thank you.

17        MR. HORSTMANN:  It obviously required some type of --

18        THE COURT:  Yes, of course.

19        MR. HORSTMANN:  -- intravenous antibiotic.

12:07 20        Moving on, you know, obviously your Honor has seen why

21   this case went to trial.  We don't agree about anything with

22   the government, including what Mr. Markham just said.  The

23   government, like any party before the Court, is entitled to

24   zealous advocacy, and that's what the government is getting

25   here is very zealous advocacy.  But the numbers that they're

1    requesting you to sentence my client to are outrageous.  I've

2    been handling white-collar cases in this building for 30 years.

3    I've never had a client sentenced to this kind of range.  It's

4    not a reasonable request, based on the facts or based on the

5    law.

6              What the government has ginned up here as some sort

7    of, you know, real estate investment in Nigeria is just social

8    media talk.  It's banter.  The photograph on Page 13 of the

9    government's memo, I mean, that's a latrine.  That's not the

12:08 10   foundation of any palace that's being built in Nigeria.  I've

11   been to Africa.  That's what a latrine looks like.  I mean,

12   these are pictures that are being shared on the Internet; they

13   have no evidentiary value at all.

14             And the government's bigger point which is clever, but

15   I don't think your Honor can draw that conclusion, is that

16   because they're building something in Nigeria, they're the

17   masterminds of the scheme.  That's not true at all.  That's not

18   how these things work.  That's not the evidence in this case.

19   The money that was going back to Nigeria --

12:09 20            THE COURT:  I agree with you.  I'm not giving him

21   leadership role.

22             MR. HORSTMANN:  But part of the presentation you just

23   heard was intended to influence you to apply these Guidelines

24   as opposed to 3553, and even to the high end of the Guidelines

25   is what Mr. Markham just said, so I'm trying to diffuse that.

 1    I think these scams have a purpose.  The purpose is to get

 2    money out of the U.S. and to other individuals, the master

 3    minds, the leaders in other countries.  And here the money that

 4    was wired back to Nigeria is going somewhere else.  It's not

 5    going to Henry Omoruyi.  The government just either stopped its

 6    investigation at that point or ran into a wall because it can't

 7    get records from the Bank of Nigeria as to who the real

 8    perpetrators are.

 9            And one of the reasons why I wanted to provide you

12:09 10    with Mr. Njei, Gustaf Njei's PSR, because that describes the

11    full extent of how these schemes work.  The money gets --

12            THE COURT:  Yes, I was confused about that.  Was he

13    part of this scam, or was it completely someone else you used

14    to represent?

15            MR. HORSTMANN:  It's a completely different scam, but

16    it's the same idea.  He was convicted of opening bank accounts

17    under a fake identity, and those accounts accumulated similar

18    amounts that we're asking the Court to sentence Henry to under

19    3553, because it's a realistic value of what he did, not what

12:10 20    others did but what he did.  And there's very little evidence

21    in this case that these two brothers communicated at all, and I

22    think for purposes of aggregating their conduct, there's not a

23    lot of evidence of that here.

24            The photographs are interesting, but they're just

25    photographs.  There's no evidence that any palace was built in

Nigeria.  And I think the fair assumption, the fair conclusion is that this money that was being sent back to Nigeria wasn't their cut.  That was the money that was destined for whoever is running the scheme, like Old Soldier in the *Njei* case.  That was their cut.  Just because the government hasn't developed or learned who that person is doesn't mean that it's Henry's money, and he shouldn't be punished at that level.  He should be punished as someone who opened bank accounts in a fake name and who accepted money from other individuals, and that's the extent of his activity here.

The worker's comp fraud allegations are just a nice way for the government to prove criminal intent here.  It's not evidence of any greater crime.  These bank cards that are found in the storage facilities, anybody can get those.  You can get those at any supermarket.  So if we actually had an accounting of it, I expect that it would be duplicative of other amounts that ran through the account.

There was a calculation in the PSR that shows the amount of cash that came out of these accounts.  That cash can be taken to supermarkets, Wal-Mart, to purchase these Green Dot cards, which now have a cash value.  That's how it's done.  It doesn't mean that all of those credit cards are associated with defrauding individuals in various states of what the government has described as "pandy," the pandemic unemployment fraud piece of this.  And there's no evidence that that accumulated more

1    than --

2         THE COURT:  At least one of them flowed through your

3    client's account.

4         MR. HORSTMANN:  Eight thousand bucks, your Honor.  I'd

5    be happy if you sentenced him at the $8,000.  I mean, we

6    wouldn't be here.  There would be no federal case if this was

7    an $8,000 pandemic fraud loss.  And I think that's my overall

8    point, your Honor, is I don't think the government sat down and

9    crunched these numbers because they think that they wouldn't

12:13 10   add up to anything significant.  If they thought it added up to

11   anything significant, they'd do it.

12         And the same is true for their argument that, you

13   know, these victims are never going to be paid back, so you

14   should sentence them higher because these victims are never

15   going to be paid back.  I mean, that's absurd, your Honor.  If

16   the United States government wanted to find a way to make sure

17   these victims were paid back, we'd have a different system.

18   They wouldn't be deported.  They would be on bracelets for the

19   next 20 years and held accountable for whatever they earn in

12:13 20   the workplace in order to pay people back.  That's not the

21   system.  It's not Henry's fault that the system deports him and

22   then says, you know, "You earn 15 cents an hour in Nigeria.

23   Please pay back this $1.5 million restitution award."  I mean,

24   that doesn't make any sense at all, and I would respectfully

25   submit that you can't take that out on them in sentencing.

1          On the contrary, what they will be sentenced to is a

2     significant loss.  If they are sentenced, they will do harder

3     time.  They will be sentenced to a medium facility, and they

4     will be deported.  And they'll be away from their family and

5     loved ones who are American Citizens who will remain here

6     probably for the rest of their natural lives unless the

7     immigration system changes; and that's a significant loss,

8     that's a significant hardship which I think the Court can

9     consider.

12:14  10          I would ask the Court -- I didn't do this in my memo,

11     but the Njei PSR obviously needs to be sealed.  That should not

12     be part of the public record.

13          THE COURT:  Excuse me?

14          MR. HORSTMANN:  The PSR for my other client, Mr. Njei

15     who --  It's a weird spelling.  It's N-j-e-i, but it's

16     pronounced Jay, Gustaf Njei.  I would ask that that be sealed.

17     That would be Exhibit 1 for the defense.  His judgment I'd ask

18     be marked as Exhibit 2.  And I have photographs, your Honor.  I

19     recently observed a Superior Court judge admonishing an

12:15  20     attorney for putting family photographs into evidence for the

21     purpose of influencing the court.

22          THE COURT:  I always take photographs.

23          MR. HORSTMANN:  All right, I just wanted to be sure

24     before I did it.  I would ask that these be marked as

25     Exhibit --

 1          THE COURT:  It's about his new baby?  Is that it?

 2          MR. HORSTMANN:  Yeah, father and daughter pictures

 3    that are quite illustrative of Henry's very close relationship

 4    to Destiny, who is here but not in the courtroom.  Or she's

 5    here, happily sleeping, your Honor.  I spent some time with

 6    her.  She's a beautiful little girl, and Henry is obviously

 7    very close with her.

 8          The other things that I'd ask --

 9          THE COURT:  They're beautiful pictures.  She's a

12:16 10    beautiful child.

11          DEFENDANT OSAKPAMWAN OMORUYI:  Thank you, your Honor.

12          MR. HORSTMANN:  Thank you, your Honor.

13          We've addressed the Macpherson issue.  You know, I'm

14    glad that your Honor didn't see fit to include that calculation

15    in loss, but I think there's another issue with respect to

16    Macpherson that you need to consider, and it goes to the idea

17    that these are not the -- Henry is not the mastermind of this.

18    He's not the leader.  You saw the storage facility --

19          THE COURT:  Yes, he's the middleman.  He set up the

12:16 20    account and sent it to Nigeria.

21          MR. HORSTMANN:  Maybe a little lower than middle, your

22    Honor, but I'm glad you have that assessment because --

23          THE COURT:  I didn't add leadership.  I took him out

24    of the -- I gave him the variance downwards.  I mean, he's

25    gotten the breaks that the record reflects.

1          MR. HORSTMANN:  Guideline breaks, your Honor.

2          THE COURT:  Yes, Guideline breaks.

3          MR. HORSTMANN:  Macpherson you saw during trial,

4   because we admitted the records, entered the storage facility

5   35 times compared to Henry's three times.  I mean, that shows

6   you who was in charge of what's in the storage facility.  It

7   shows you who wanted access to the storage facility, who needed

8   access to the storage facility.  Yes, there was stuff in there

9   that belonged to Henry, but there's also the access.  The

12:17 10  access proves everything you need to know in this case.

11  Macpherson, quite frankly, was higher up the food chain than

12  Henry, and he received a much less significant sentence than

13  the government is recommending here today.

14          THE COURT:  Yes, you know, you probably know this:  We

15  sent out a proposed rule so this wouldn't happen anymore, which

16  is that we'll keep related cases with the same judge.

17          MR. HORSTMANN:  I think that's a good idea, your

18  Honor.

19          THE COURT:  I don't know if anyone has seen that.

12:17 20          MR. MARKHAM:  I have, your Honor.

21          MR. HORSTMANN:  But, you know, like Mr. Njei's case,

22  another reason I wanted Mr. Njei's PSR in the record is, these

23  trees of money laundering have branched; and it's been my

24  experience that defendants get sentenced for their branch, not

25  the entire tree.  And what Mr. Markham is suggesting the Court

1  do in this case is to sentence Henry for the entire tree.  I

2  agree you've excluded the --

3         THE COURT:  I've just included the money that flowed

4  through his account.

5         MR. HORSTMANN:  Well, but you've included his brother.

6  You've included 2018.

7         THE COURT:  Fair, the brother.

8         MR. HORSTMANN:  You've included 2019.  You know, I

9  mean, there's a lot that's included here that we've objected to

12:18 10  under the Guidelines, but I think realistically, for 3553

11  purposes, he should be held accountable for simply what his

12  conduct was here.  And his conduct here is significantly less

13  than the Guidelines.  It's significantly less than what the

14  government is asking you for.  And, quite frankly, I'm

15  delighted with the two-level reduction for first-time offender,

16  but that's not enough.  I mean, that is what it is, but, you

17  know, in the real world, your Honor, people don't necessarily

18  reoffend after the first larceny conviction, after the first

19  fraud conviction.  And these are, you know, sort of fictitious

12:19 20  Guidelines when it comes to that.  He has no criminal record.

21  He's been in this country for almost ten years, and he has no

22  criminal record except for this case.  He should be sentenced

23  as a first-time offender, which would normally mean a very

24  light sentence.  He would be able to repay restitution and be

25  on his way.  But it just -- that's not the way it works with

1    the Sentencing Guidelines, and I submit that that's one of the

2    inherent unfair applications of the Sentencing Guidelines is,

3    it doesn't go far enough to treat people as the first offenders

4    that they really are.

5             THE COURT:  You said he doesn't want to say anything?

6             MR. HORSTMANN:  I don't believe he does, your Honor.

7    I never commit until the last moment, but --

8             THE COURT:  Fair enough.

9             MR. HORSTMANN:  So what we're asking for, your Honor,

12:20 10   I put in my first memo.  I do believe that Henry is the kind of

11   person, based on the amount of time I've spent with him -- he's

12   very interested in this case, he's very active in this case,

13   he's a very hard-working man -- he was driving, he was working

14   in HVAC -- he is capable of gainful employment and working

15   multiple jobs, and he belongs in a community that includes his

16   family, and we're asking that you sentence him to time served,

17   that he be given a year of home confinement with the bracelet

18   that he was on during this trial, based on what I considered to

19   be a very remote threat of, you know, from -- somebody made a

12:20 20   threat in Nigeria.  We don't know -- somehow it fell at Henry's

21   lap.

22             THE COURT:  Well, I'm not going to take that into

23   account because I don't directly tie Henry, as opposed to maybe

24   someone in his family, to Nigeria doing it.  So I don't know

25   who did it, but it was enough of a concern that I modified his

1    conditions of pretrial release, but I'm not going to add an

2    obstruction for witness intimidation or anything like that.

3         MR. HORSTMANN:  Mr. Njei got 27 months from

4    Judge Saylor, who's no shrinking violet when it comes to

5    sentencing.  I think --

6         THE COURT:  He's no what?

7         MR. HORSTMANN:  Shrinking violet when it comes to

8    sentencing.  I think these sentences need to be treated as they

9    are.  There's victims out there, as Mr. Markham said, who need

12:21 10   to be repaid, and the only way they're going to be repaid is if

11   Henry works, and the only way he can work is if you don't send

12   him to jail.  So that's where we are.  I appreciate the Court's

13   time.  I appreciate --

14        THE COURT:  He wants the RDAP program?

15        MR. HORSTMANN:  Yes.

16        THE COURT:  Yes, that makes sense.  He has an

17   alcoholism problem?

18        MR. HORSTMANN:  Yes.  Thank you, your Honor.

19        THE COURT:  Thank you.

12:21 20        MR. MARKHAM:  Your Honor, if I could just put one

21   thing on the record.  It's just a related -- we talked about

22   related cases.  This was in the government's sentencing memo.

23   There was another case that came from this --

24        THE COURT:  Judge Zobel's.

25        MR. MARKHAM:  Yes, your Honor.

           1              THE COURT:  I couldn't pronounce the name.

           2              MR. MARKHAM:  You know, I'm not going to try because I

           3     won't do any better, but if the Court was going to consider

           4     other sentences, we'd ask you to consider that one and have it

           5     be --

           6              THE COURT:  How long was that again?

           7              MR. MARKHAM:  63 months, and that was on a guilty plea

           8     pretrial when, you know, they didn't have all the evidence to

           9     put in.  Thank you.

12:22     10              THE COURT:  That's right, that is appropriate.

          11              MR. HORSTMANN:  This is why I never commit, your

          12     Honor.  Mr. Omoruyi would like to say something.

          13              THE COURT:  Of course.

          14              DEFENDANT OSAKPAMWAN OMORUYI:  Thank you very much,

          15     your Honor.

          16              THE COURT:  Can you make sure -- I've got to make sure

          17     I can understand you, and so speak right into the mic.

          18              DEFENDANT OSAKPAMWAN OMORUYI:  Thank you very much,

          19     your Honor.  I want to say I apologize to the Justice

12:22     20     Department --

          21              THE COURT:  Already I'm just having a little trouble.

          22     You want to say what, sir?

          23              DEFENDANT OSAKPAMWAN OMORUYI:  I apologize to the

          24     Justice Department, your Honor, for taking you guys through

          25     this process.  And I apologize to my family and my father and

my mom, and most especially my beautiful wife, who over the
years we passed through this whole issue before you, your
Honor.  I say thank you.

THE COURT:  Thank you.  All right, so let me just say
I am going to -- I have to start with the Guidelines, but I
don't necessarily have to end with the Guidelines, but I take
them seriously, and the Guidelines are 78 to 97 months.

Let me begin by the -- I have to go through the
3553(a) factors, which are basically the statutory factors, and
they begin with the seriousness of the offense.  I sat through
a whole long trial.  I was struck by the extent of the offense
over multiple years, the number of people affected that I heard
from, women who were humiliated and lost their money and lost
trust.  And the harm to them was not just monetary; it was
emotional.  And some of them were really -- all of them were
from different walks of life.  Some of them were very
intelligent, and yet they were basically defrauded using human
emotions, like, they fell in love with these people.

Now, I understand the defendant was not one of the
front men, as you all have been calling them, but he was the
money who took the money into his accounts, sometimes in his
personal accounts, sometimes under these other phony names like
Clifford Bernard.  And if you add to that the fact he was
personally involved in defrauding unemployment compensation
during the pandemic, I think he was deeply involved in a

far-reaching and broad fraud.  So I'm declining to go to the
high end of the sentence of the Guideline range because of two
things:  One is, it's a little gray about whether or not you
consider 2018 and how deep into 2018.  I definitely didn't
consider 2016 or 2017, but whether it's at the low end of one
Guideline range or the high end of the other, I will add that I
would have gone to the high end of the other if I had gone down
based on 2018.  So the high end of the other was 78, which is
what I'm going to give low end here, which is basically six and
a half years.

So I was looking for some reason whether I should
vary.  I do take seriously the fact that you have a beautiful
daughter and obviously a family that cares for you that's
sitting back there.  One of the things I've most commonly said
over this, believe it or not, 30 years I've been a judge is
that many of the victims of these crimes are actually the
families.  The wife and the child suffer from crimes committed
by their loved ones.

But I do think that you were deeply involved, and it
wasn't just these phony bank accounts.  It was that storage
unit.  And it was not aberrant at all, and I don't think you've
recognized the harm that was done.  While there was an apology
to the family, I don't blame you for not apologizing in general
because I know you're probably going to appeal this, and you
say, you know, the government hasn't met its burden; but

1  nonetheless, it did have a far-reaching impact on the people

2  who were affected by this fraud.

3        In general, there aren't -- I was looking for

4  something mitigating here.  I will recommend the alcoholism

5  RDAP program.  Despite Mr. Horstmann saying you should stay

6  here, the work that you did wouldn't even begin to account for

7  some of the money that was in these bank accounts.  I mean, I

8  didn't know this before, but, I mean, you worked at DoorDash

9  and certain temporary positions as a driver for Uber and Lyft.

12:27 10  I mean, it couldn't account for the volume of money that was

11  sent to those Nigerian accounts, nor, as a practical matter, is

12  restitution even possible.  It says here that you don't have

13  any...  It doesn't look like there's been any income that's

14  been reported.  So I will not impose a fine because I think

15  restitution would be almost impossible anyway, should he stay

16  in the country.

17        And I just want to circle back to the issue of

18  deterrence, which is, I do think it's not necessarily

19  deterrence as to you because you'll probably be back in

12:28 20  Nigeria, but I do think it's important to send the general

21  message out that when you commit a fraud -- Mr. Horstmann maybe

22  hasn't had these cases, but actually six and a half is a

23  relatively low sentence in the scheme of fraud cases.  As you

24  may have noticed from the -- just in reports, that in general

25  they're 103, but those are higher and didn't really work here

1    because came down so much on the Guidelines, so it didn't

2    become relevant.  But I don't know, maybe you don't get that

3    many fraud cases, but basically here there was real harm caused

4    to real people, and that's what I'm going to do.

5            I will recommend, so you can be close to your wife and

6    children, Fort Devens.  I don't know if that's feasible given

7    the fact that he will probably be deported.  I also recommend a

8    facility that deals with alcohol abuse, and I think that

9    basically --

12:29 10         Special assessment is how much money?  It's --

11           MS. MARCY:  $300.

12           THE COURT:  $300, thank you, for the special

13    assessment.  And I think that no fine, no supervised release

14    because he's going to be deported.  He's a green card holder,

15    right?

16           MS. MARCY:  Given the length of his sentence, I think

17    I would recommend supervised release just in case for some

18    reason he does not get removed.

19           THE COURT:  So maybe two years?

12:29 20         MS. MARCY:  Sure.

21           THE COURT:  All right.  And I think that basically

22    does it.

23           (Discussion between the Court and Clerk.)

24           THE COURT:  All right, yes, the special conditions

25    recommended is, you must not either yourself -- and I'm going

 1    to say this to all the family members -- as I've said before,

 2    have any contact, direct or indirect, with any of the victims.

 3    You must use your true name and not the aliases like Clifford

 4    Bernard.  If ordered deported, you must leave the United States

 5    and not return without prior permission of the Department of

 6    Homeland Security.  You must pay the balance of any restitution

 7    according to a court-ordered repayment schedule.  You are

 8    prohibited from incurring new credit charges if you're allowed

 9    to stay in the country, and you must provide the Probation

12:30 10    Office access to requested financial information, which may be

11    shared with the Asset Recovery Unit of the U.S. Attorney's

12    Office.

13              I sort of agree with the government on this, which is,

14    I think as a practical matter, you'll be deported.  And I don't

15    know what treaties we have with Nigeria, but as a practical

16    matter, although we will issue a restitution order -- hopefully

17    you'll agree on it, but if you don't, I will issue one -- but I

18    don't really see as it's likely that it would be repaid.  And

19    even if he were to stay here, he's not earning that kind of

12:31 20    money that it's realistic to pay the amount.

21              Okay, I think that's probably about it.  Read the

22    notice of appeal rights, and then we'll take a quick break and

23    we'll switch.

24              (Discussion between the Court and Clerk.)

25              THE COURT:  I'm hoping you'll work it out, and I'll

1    just sign it.

2          MR. MARKHAM:  Yes, your Honor.  That's what we

3    anticipate.

4          THE COURT:  And obviously it will be subject -- and

5    not the Macpherson people, just the ones that flowed through

6    his account, both accounts.

7          MR. MARKHAM:  Yes, your Honor, we'll take out 16 and

8    17 and Macpherson, provide you those numbers.  And I think

9    there is going to be a question of whether it's joint and

12:31 10   several among the defendants.  I can --

11          THE COURT:  But I want to not defer on that until I

12    hear from Mr. Tzeng.  I haven't done that.

13          MR. MARKHAM:  Yes, your Honor.

14          THE COURT:  Okay, do you want to read the notice of

15    appeal rights.

16          THE CLERK:  Sir, could you please stand.  The Court

17    hereby notifies you of your right to appeal this sentence.  Any

18    appeal from this sentence must be filed with fourteen days of

19    entry of judgment on the docket.

12:32 20          Do you understand these rights?

21          DEFENDANT OSAKPAMWAN OMORUYI:  Yes.

22          THE COURT:  So I think we'll do the switch.  The

23    Marshals Service, do you want to bring him back downstairs, or

24    do you want to just leave him out back and bring in

25    Mr. Osaretin Omoruyi?

1           THE MARSHAL:  Yes, your Honor, we're going to bring

2     him downstairs.

3           THE COURT:  But what are we going to do?  Is

4     Mr. Osaretin out back right now?

5           THE MARSHAL:  Yes.

6           THE COURT:  Okay, we'll do the swap.  Five minutes,

7     okay?

8           THE CLERK:  All rise.

9           THE COURT:  You know what?  Excuse me, Mr. Horstmann.

12:33 10    I'm sorry.  Do you want his wife and children part of the

11    record?  I would say "no."  I've seen them.  I don't want it to

12    be public.  They're beautiful pictures, but --

13          THE CLERK:  Thank you, Judge.  Thank you.

14          (A recess was taken, 12:33 p.m.)

15          (Resumed, 12:45 p.m.)

16          THE COURT:  All right, government.  And I'm doing a

17    completely separate sentencing.  I want to make sure everybody

18    realizes I'm treating separately, so --

19          MR. MARKHAM:  Yes, your Honor, I did speak with

12:45 20    defense counsel beforehand, and just for ease of record, he's

21    adopting essentially the same legal arguments made.  He was in

22    the room, for the record, and adopts the same legal arguments

23    made by --

24          THE COURT:  Right, but I want to hear about his client

25    individually.

         1          MR. MARKHAM:  Yes, your Honor.  I just wanted to make

         2   clear for the record, I'm not objecting to him simply adopting

         3   by reference the legal arguments.

         4          THE COURT:  Fine.

         5          MR. MARKHAM:  And at the same time, I will tailor my

         6   arguments accordingly in terms of the length and going into the

         7   detail, but the Guidelines are the same.

         8          THE COURT:  The Guidelines are exactly the same, and

         9   so I think you need to go through the 3553(a) factors.

12:45  10          MR. MARKHAM:  Yes, your Honor.  Once again, the

        11   government has asked for a higher end of the Guidelines

        12   sentence in this case for four key reasons among all the, you

        13   know, evidence that you saw in the case.

        14          First, Osaretin Omoruyi knew what these scams were,

        15   including romance scams.  He's actually in a particular

        16   position in terms of his level of knowledge in front of the

        17   Court because his phone was so central to this case, and all of

        18   those text messages you saw at trial came from his phone.  So

        19   when Henry sends a text message when their friends get arrested

12:46  20   for romance scams, that text message is to Osaretin Omoruyi.

        21   When there's a text message talking about the mugus, that's to

        22   this defendant.  When there's the text message talking --

        23          THE COURT:  And just for the record, the mugus means

        24   the fools, but he didn't use the word; somebody else used it to

        25   him, right?

1            MR. MARKHAM:  Correct, your Honor.  This is about his

2       level of knowledge as to what the scams were.

3            THE COURT:  I see, I see.

4            MR. MARKHAM:  The government concedes that there's no

5       evidence that he was talking to the victims.  It's about

6       whether he knew what these were fundamentally, which goes to

7       his culpability; and the government's point is that unlike in

8       other cases where the defendants can plausibly say at sentencing

9       they had no idea where this money is coming from, that just

12:47 10       isn't the case here because you have their internal text

11       messages contemporaneous with the crimes.

12            You also know how devastating these results were to

13       the victims.  You heard them testify at trial.  You've seen

14       their impact statements talking about fear, shame, embarrassment,

15       and the devastating financial consequences that have occurred.

16       It's hard to know whether the financial consequences are worse

17       than the emotional consequences when some of these victims have

18       talked about not going back out into the world anymore because

19       they just don't trust anyone.  But they're both devastating,

12:47 20       and the Court should consider both of those consequences for

21       victims and the defendant's knowledge of those consequences, or

22       at least what these victims were.

23            This particular defendant shows no remorse.  Even

24       after his being convicted at trial and the mountain of evidence

25       against him, he objected to the PSR by saying, I quote, "The

```
 1   defendant maintains his innocence," end quote.  Now, I
 2   understand some of this --
 3            THE COURT:  That's his right.
 4            MR. MARKHAM:  Yes, your Honor.
 5            THE COURT:  I mean, it always puts people in an
 6   awkward position, right, when they put the government to their
 7   burden because if they --
 8            MR. MARKHAM:  So he's already been convicted, your
 9   Honor.
10            THE COURT:  -- it would have been more if they're
11   essentially admitting it.
12            MR. MARKHAM:  Well, I would just tell you the
13   government's position, your Honor, is that if you put the
14   government to their proof and they prove it, and then you come
15   in at sentencing and you show some remorse, the Court should
16   consider people who show real remorse for their crimes,
17   absolutely.  And the only possible flip side of that coin is
18   that if someone is refusing to accept any responsibility or
19   express any remorse, you should consider that as well.  I'm not
20   saying it's the driving factor.  If this defendant thinks it's
21   worth it to not accept any responsibility because of an
22   appellate issue --
23            THE COURT:  So is there any distinction between the
24   brothers?  Is there anything that Osaretin Omoruyi did that
25   makes it either more or less culpable in your mind?  He did not
```

have the storage cabinet or the storage thing where people were

coming in and out of.  He was only marginally -- if I'm

remembering correctly, was he once there?

MR. MARKHAM:  Yes, your Honor.  So the storage unit I

would put squarely in the Henry column.

THE COURT:  Right.

MR. MARKHAM:  There was a conspiracy, but he was the

name on the -- he was the one paying for it.  He was the one

who opened it.  The video shows him going into it from the

trial testimony.

THE COURT:  Right.

MR. MARKHAM:  On the other side is that Osaretin

got -- more money flowed through his accounts, substantially

more money.  Hundreds of thousands of dollars flowed through

his accounts, more than Henry's accounts, which would make him

more culpable.  He had a fake company in addition to his fake

identities, which would add to that level of culpability.  And

I don't think that fake company is really just a side issue.  I

do think it's important to consider because the charges of

conviction, the crimes of conviction is bank fraud; and part of

the issue is the amount of time and effort the banks have to go

through to sort out who these fake people are and get money

back.  And what the Court heard at trial was bank personnel who

called the number on the Zion Cleaning account and asked, you

know, "Hey, this money is come into your account.  What is this

from?" and all they got in response was lies.  And then they
have to spend years essentially doing these investigations and
working with the government at trial.

Now, of course the romance scam victims are far more
sympathetic than massive banks, but it's something you should
consider in terms of what a scourge this type of conduct is on
our society, what the banking system has to deal with when
people are opening these phony accounts.  So there's the more
money; there's the additional fake company.

And then there's the text messages which I mentioned
briefly beforehand, but you simply do just have far more
evidence of Osaretin's very close coordination with overseas
co-conspirators because you have his text messages.  The
government provided a couple of examples in its sentencing memo
where essentially Osaretin receives the Clifford Bernard, so
Henry's, fake bank information, immediately sends it to his
co-conspirator overseas.  That bank account gets fraud
proceeds.

When that bank account is shut down several months
later, Osaretin immediately gets another fake bank account from
his brother, which he then sends to that same person overseas,
and he gets more fraud proceeds.  So you can see how Osaretin
in this situation, from the evidence we have presented at
trial, is the one pushing more of this information overseas to
the co-conspirators, including for his brother's accounts.  And

1   that lines up with the amount of money he's getting, right?

2   Hundreds of thousands of dollars more makes sense if he's the

3   one who has closer contact with the overseas co-conspirators.

4            And then, lastly, just what they're spending this

5   money on overseas.  I know I spoke earlier about how rare the

6   fraud cases is where you have a defendant before you who's not

7   only not going to pay any of the money back, but is probably

8   going to have it, his cut, his 30 percent cut, 25 percent cut,

9   whatever it was.  Depending on the specific deal, they're going

12:52 10  to get to keep that.

11           And so you have to decide what's an appropriate

12   sentence, what is a sentence of specific deterrence and a

13   general deterrent message for people who get to keep the money.

14   And these pictures that are in the PSR of this mansion being

15   built in Nigeria, these are not pictures that were taken off

16   the Internet.  It says "Client, Mr. Osaretin Omoruyi."  There's

17   tons of these pictures, schematics from a construction firm,

18   and the client is Osaretin Omoruyi.  There was the other

19   picture of the Omoruyi Apartments where it says their name on

12:53 20  the side.  And these are pictures you have before you of what

21   they likely have the opportunity to go back to, including

22   pictures of construction of these buildings.  So I think in

23   those ways, Osaretin Omoruyi --

24           THE COURT:  Is there no treaty with Nigeria?

25           MR. MARKHAM:  Your Honor, my understanding -- I've

1    sent extradition requests to Nigeria, for instance, on arrest

2    warrants; on or about one in one hundred.

3          So this is what we're dealing with.  What we're

4    dealing with is these frauds coming from there.  Our ability to

5    go get the people perpetrating the fraud is minimal.  But these

6    frauds cannot happen, they're impossible, without people like

7    Osaretin Omoruyi who are willing to participate in them.  So

8    this is our bottleneck.  This is our chance to combat these

9    frauds.  And in cases like this where they know what the frauds

12:53 10   are and they get to keep the money, there is just no reason to

11   depart below the Guidelines.  In fact, the government's

12   position is, you should give a sentence at the high end of the

13   Guidelines.

14          THE COURT:  Thank you.

15          MR. TZENG:  Thank you, your Honor.  If I'm going to be

16   successful at all in convincing the Court that a below

17   Guideline range sentence is appropriate for Osaretin Omoruyi,

18   it will not be because of the factors that Mr. Markham just

19   went through or the evidence that came in at trial.  It will be

12:54 20   because hopefully what I've done is paint a picture for the

21   Court of who Osaretin Omoruyi is as a person.

22          Now, the Court has before it the sentencing memo that

23   I submitted, and included with that -- and I'm not sure if the

24   Court had received it, but I did file it on ECF -- were photos

25   of Osaretin Omoruyi as well as his family?

```
 1                THE COURT:  Yes, with his little boy?
 2           MR. TZENG:  Yes.  That is Zion.
 3                THE COURT:  And various letters, yes.
 4           MR. TZENG:  That's his son, yes, and the various
 5      letters.
 6                THE COURT:  His name is Zion, right, like the company?
 7           MR. TZENG:  It is.  His birth certificate was admitted
 8      by the government at trial in support Mr. Osaretin Omoruyi's
 9      conviction.
12:54 10           You know, I haven't been practicing in this court as
11      long as Mr. Horstmann has, but I have been around long enough
12      to understand that where I am coming in as substitute counsel
13      and prior counsel is somebody who's reputable, experienced, and
14      effective, it tends to make me get my guard up about why, you
15      know, the defendant and prior counsel have sort of parted ways.
16      I was still confused --
17                THE COURT:  Who was the prior counsel?
18           MR. TZENG:  It was Mr. Scully, William Scully, your
19      Honor.  And so, you know, in the first meeting with the clients
12:55 20      in this case, Mr. Omoruyi, it's -- you know, that's sort of
21      what I try and figure out first.  Like, what went wrong?  How
22      can our relationship be successful?  And the person who walked
23      into my office in my conference room that day was somebody who
24      appeared to be honest, forthright, hard-working.  He's a son.
25      He's a father.  He's a brother.  He's very much family-oriented.
```

1    he had a full-time job working as a personal care assistant.

2    We actually had to work significantly around his work schedule

3    just to have the in-person meeting.  So in meeting him in

4    person, it still did not answer for me any questions about how

5    the relationship broke down with prior counsel because here was

6    this perfectly reasonable person who was walking into my office

7    who I was meeting.

8         What I also figured out that day in going through the

9    discovery was that this person, the evidence likely established

12:56 10  that this person was in a lot of trouble, and it was my duty

11   and responsibility to shepherd Osaretin Omoruyi through this

12   legal process.  This was not a case that could have pled

13   because of the immigration issues, and I'll get to that in a

14   second.  But what I couldn't still figure out is how the person

15   that I've come to know as my client and the personal

16   characteristics that he exhibits in terms of family, in terms

17   of work, it was just totally incongruent with what was

18   demonstrated in the evidence, particularly this phone.

19        Now, I have gone through the evidence obviously tooth

12:57 20  and nail.  I've tried to do what I could at trial to lessen the

21   impact of that evidence at trial, but that was my job.  And

22   similar to indicating in the PSR objections that he maintains

23   his innocence, that's coming from me.  That's not coming from

24   him.

25        THE COURT:  I understand that.

1           MR. TZENG:  So I'd ask that the Court not necessarily
2   take that out against him.  But I tried to paint -- I selected
3   two stories on behalf of Osaretin Omoruyi in his life, but
4   there are certainly more than that.  I tried to paint a picture
5   for the Court about what life was like for him in Nigeria, in
6   particular the tragedy regarding his mother's health situation.
7   You know, it's one thing to say, as the PSR does, that his
8   mother had a stroke and as a result she's disabled, but
9   hopefully in painting a picture in the way I did, that I'm
12:58 10  hoping that the Court takes it, is that sudden realization.
11  Like, this has affected him as a person.  It affected him in
12  his life in Nigeria, which was modest, at best, and it affected
13  the line of work that he chose after he got here, which was as
14  a personal care assistant.

15          Now, like I said, he worked full time.  I shared with
16  the Court one story regarding just one patient named Richard
17  that he became particularly close to, and he felt like it was
18  sort of his obligation, karmically or otherwise, to try and
19  help people who couldn't help themselves.  And like I did, he
12:59 20  did this on a daily basis, so I find the incongruity between
21  what he does in his personal and professional life and what
22  happened in this case just to be -- it does not harmonize for
23  me sort of mentally.

24          A lot of the people that he worked with he developed
25  relationships with.  These were people with, you know, mental

1    and physical disabilities.  You know, sometimes the individuals

2    that he was helping would soil themselves, and, you know, it

3    was his task to sort of go about cleaning this up.

4         You know, despite the amount of loss that the Court

5    attributes to him, not the least of which is the amount that

6    was attributable to his brother, he's not living a glamorous

7    life.  He's living in an apartment complex, or he was living in

8    an apartment complex in Canton.  He had a girlfriend,

9    Ms. Muhammad, who has submitted a letter for the Court's

01:00  10   consideration, and he took on -- not only was he taking care of

11   his son, Zion, but he also took on Ms. Muhammad's daughter,

12   basically as his own child as well.

13        You know, at this point Zion is -- well, both

14   children, really, are experiencing some behavioral issues in

15   school now that he is gone.  I mean, the fact of the matter is

16   that no matter how long the Court decides to sentence Osaretin

17   for, it is likely he will be deported, and essentially there

18   will be two children that will be without him for the rest of

19   their lives.

01:01  20        Now, the pictures of the schematics, of these drawings

21   or plans that Mr. Markham referenced in Nigeria, these were

22   pictures that were sent to Osaretin's phone by his father.  The

23   fact of the matter is that there's no evidence that anything is

24   actually being built.  This was his father's dream.  It was his

25   father's dream, and these were sent to him by his father,

1    because what he wants to do is provide a better life for his

2    wife back in Nigeria who needs help.  I mean, she is

3    essentially gone, but they still need to care for her, and this

4    is what he did for years before coming to the United States.

5          THE COURT:  Wait a minute.  Who's wife?

6          MR. TZENG:  Osaretin's mother.

7          THE COURT:  We're talking about the same thing.

8          MR. TZENG:  Yes, exactly.  So those were his hopes and

9    dreams.

01:02 10          And in terms of aberrant behavior, I mean, I couldn't

11    imagine, you know, given the person that I've grown to know, I

12    couldn't imagine more aberrant behavior than what's in the

13    evidence that was presented at trial.  He has no prior record.

14          So in terms of a sentence, there's no doubt that the

15    crime committed is serious.  I'd ask the Court to sentence him

16    based on the behavior that he was convicted of and nothing

17    more.  And in terms of fashioning what might be a fair sentence

18    in this case, I would ask the Court to look at Macpherson

19    Osemwegie, and he got 32 months.  Obviously he didn't take his

01:02 20    case to trial, so at least under the Guidelines, he gets a

21    three-level reduction, but the Court is not bound by the

22    Guidelines.  And if he was involved in this conspiracy to the

23    degree that Osaretin was and that Henry was and he gets 32

24    months, I think it's only fair, only fair that Mr. Osaretin

25    Omoruyi get a sentence in that timeframe.

1         THE COURT:  But I heard that the other gentleman

2    sentenced before Judge Zobel was 62 months, which is in the

3    same ballpark.

4         MR. TZENG:  But that was not a co-conspirator in this

5    case.  That's a different case that Mr. Horstmann had raised.

6    That's not part of this conspiracy.  I'm just trying to figure

7    out --

8         THE COURT:  It wasn't the Njei guy.  This is somebody

9    else whose name begins with I.  Was that part of this?

01:03 10        MR. TZENG:  Not as far as I know.

11        THE COURT:  All right, okay, I'll ignore it.

12        MR. TZENG:  So, I mean, if Osemwegie gets 32 months

13   because he gets a level of reduction for acceptance of

14   responsibility and the government decided at that point not to

15   tack on losses attributable to Osaretin as well as Henry, then

16   what I have to try and do is figure out, okay, beyond the

17   Guidelines, what is a fair sentence?  And if he was doing the

18   same thing and he gets 32, then I think that Osaretin Omoruyi

19   in similar circumstances should get substantially a similar

01:04 20   sentence, or else he's being penalized for having gone to trial,

21   in which this was always going to be a trial case.  Despite my

22   conversations with the government, despite my conversations

23   with Mr. Omoruyi, he could not plead, or else he was going to

24   be deported because that's what the rules are.  And so I'd ask

25   you not to punish him for going to trial.  I'd ask you not to

1  punish him because he's going to be deported.  Mr. Horstmann

2  already made a very articulate argument about the reasons for

3  transfers back to Nigeria.  But, you know, what I have to try

4  and argue to the government is, you know, fair is fair; and if

5  32 months was fair for Macpherson Osemwegie, then something

6  similar to that should be fair in this case as well.

7       THE COURT:  Does he want to say anything?

8       MR. TZENG:  Yes, he does.

9       DEFENDANT OSARETIN OMORUYI:  Thank you very much, your

01:05 10  Honor.

11       THE COURT:  I want to make sure I can hear you.  If

12  you want, you can sit down.  I won't view that as

13  disrespectful.  Just speak into the mic, please.

14       (Pause.)

15       DEFENDANT OSARETIN OMORUYI:  Thank you very much, your

16  Honor, for giving me this privilege to speak in your court

17  today.  My name is Osaretin Omoruyi Godspower.  I was born on

18  the 1st of January, 1987, in Nigeria --

19       THE COURT:  I'm sorry.  I'm just having a little bit

01:06 20  of trouble hearing you, and I know you're being tearful.  Why

21  don't you take a couple of minutes.  Do you need Kleenex,

22  tissues?  Here.  Maryellen?

23       (Pause.)

24       DEFENDANT OSARETIN OMORUYI:  Your Honor, thank you

25  very much for giving me this privilege to speak in your

honorable court today.  My name is Osaretin Omoruyi Godspower.
I was born on the first of January, 1987, in Nigeria Edo State,
Benin City, into the family of Mr. and Mrs. Omoruyi.  I am the
first son of my family.

I am the father of two beautiful children.  One is my
biological son, and the other one is my stepdaughter.  These
children are my source of joy.  I love them down to my bone.
Also, I am the proud uncle to my nephew and my niece.  They
idolize my good moral upbringing.

I hold a bachelor degree in business administration.
I'm also currently pursuing my bachelor's in human services.
Since 2015, I have had the privilege to be in the United States
of America as a law-abiding permanent resident of this great
country where dreams actually comes to reality.

During my entire life in this country, I have had the
privilege of working in different establishments that have
entrusted the care of operating their business into my hands.
Until June 15 of this year, I had the honor of working with
both elderly and young patients, also those with disabilities
and life challenges.  For them I was their primary contact, and
they were entrusted into my care, and they relied on my
judgment and advocacy for them.

Your Honor, I love my job, and I am pursuing my
bachelor degree in human services because I intend to stay in
this field to offer therapies and care for the powerless and

1   also those who need help.

2           As a young man in Africa, my siblings and I used to

3   provide the same service to my beloved sick mother, although it

4   was not easy for us to earn a living to take good care of her.

5   Despite the suffering, we did not go out of our good morals

6   upbringings.  Rather, we stand firmly of what we were taught.

7   We were taught love and compassion towards others because these

8   are the things my father brought us up all together with my

9   siblings.

01:09 10        Your Honor, this gave me the experience of caring for

11  others to whom I render assistance of daily living for.  Your

12  Honor, this woman is my backbones and my inspiration, strength,

13  persistence and optima.  That is my mother, who gave us the

14  privilege of being good kids when we were growing up.

15          On the charges I am standing before you here today,

16  your Honor, they are in direct contradiction to my beliefs and

17  teachings as the son of a clergyman.

18          THE COURT:  As a son -- I'm just struggling.  As the

19  son of a --

01:10 20        DEFENDANT OSARETIN OMORUYI:  As the son of a

21  clergyman.

22          THE COURT:  Who's the clergyman, your father?

23          DEFENDANT OSARETIN OMORUYI:  My father.

24          THE COURT:  Is he the one who's here?

25          DEFENDANT OSARETIN OMORUYI:  Yes.  My background and

          1    my past speak for themselves.  I hope you will take this into

          2    consideration on the decision that you will make here today

          3    because the welfare of my wife, my children depend on my

          4    services and labor for daily living.

          5         I also respect with all honor, your Honor, I respect

          6    the verdict of the jury, and I also respect the laws that abide

          7    in this country today.

          8         Your Honor, I would like to thank you very much for

          9    serving and providing unbiased judgment to the people of the

01:11    10    United States of America and to the entire people in

         11    Massachusetts too.  Thank you very much, your Honor, and may

         12    God bless you as you make your decision here today.

         13         THE COURT:  Thank you.

         14         DEFENDANT OSARETIN OMORUYI:  Thank you very much.

         15         THE COURT:  Let me start off by saying I certainly

         16    understand why Mr. Tzeng was so impressed by you when you first

         17    walked in the door, and I'm having a hard time figuring out how

         18    a person who's so tearful and who helps so much with people

         19    with disabilities, which you've done in your life, could have

01:12    20    been involved in the conspiracy like this which hurt all these

         21    women so deeply who were involved in these romance scams.  I'm

         22    trying to figure out the measure of you as a man, and I must

         23    say I'm struggling with this inconsistency here.

         24         I go through the 3553(a) factors.  It was indeed a

         25    very serious offense.  It was a lot of money involved, a lot of

it shipped back to Nigeria.  These women, probably wonderful

women too like the women in your life, were devastated, not

just because of the money they lost, but they fell in love with

these guys, and yet this guy was telling you they were mugus,

they were fools.  It shows a certain lack of compassion for

people in the human condition; and this was the scheme that you

were involved with, and it caused financial and emotional harm.

I've been struggling to find distinctions between you

and your brother.  Part of it is, I just feel like I understand

01:13 10  you as you've spoken to me, which has been very helpful.  Your

roles were a little different.  You had more money flowing

through your accounts, but you weren't involved with the

storage unit, and it isn't clear what your role was with

respect to the unemployment compensation scheme.

To the extent that there is a difference between

Judge Casper's case and this, I think that's based on different

money amounts and the fact that there was a different way of

calculating the Guidelines because he pled guilty.  And that

does not penalize your trial right, but I think it was a

01:13 20  different case.

So I must say, I'm impressed with some of the letters

I got on how you helped that disabled man.  I'm impressed with

the tearfulness with which you approach this, and while I am

sorry about your child, your children, I often say, and I'll

say it many more times unfortunately, that one of the victims

1    of these crimes are your children and your family.  They've

2    been back here.  They love you.

3         Because of the different situation, and particularly

4    you work with the disabled and looking at the 3553(a) factors,

5    I'm going to impose a sentence of 72 months, which is six

6    months less than I imposed before.  I want to make it quite

7    clear that I'm not sure what to do with the 2018.  So even if I

8    inappropriately consider the 2018 money, they're right on the

9    cusp, I would have gone to the high end of the Guidelines.  I

01:14 10   would have gone there no matter what to where I was.

11         And I am imposing no fine.  I will be imposing

12   restitution jointly with your brother and you.  I will

13   essentially impose a $300 special assessment, two years of

14   supervised release subject to the conditions that you -- I read

15   them last time -- that if you are allowed to stay in the

16   country, that you have no contact, direct or indirect, with any

17   victims in this matter.  That applies to your family as well.

18   You have to use your true name, not Nelson Bright or Bright

19   Nelson.  You have to use your correct name.  If ordered

01:15 20   deported, you must leave the United States and not return

21   without prior permission of the Secretary of Homeland Security.

22   I know that will be difficult because your family will be here,

23   but as I just heard, your mother is still in Nigeria, you have

24   family there too, but you cannot come back.

25         You must pay the balance of any restitution according

1    to a court-ordered repayment schedule.  You are prohibited from

2    incurring new credit charges or opening new lines of credit.  I

3    think this is all moot, actually, because I think you'll be

4    deported right away.  And you must provide the Probation Office

5    access to any requested information, which may be shared with

6    the Asset Recovery Unit of the U.S. Attorney's Office.

7            I will add to that that while I do think you were

8    genuinely devoted to the people that you helped in healthcare

9    services and to your family, I hope you own in your heart --

01:16 10    you say you're father is a clergyman -- the harm that you did

11    to the people we heard from at trial, harm that they'll carry

12    in their heart for a very long time, and I'd like to believe

13    that the reason you were so tearful was some sort of

14    acknowledgement of that.

15            Maryellen?

16            MR. TZENG:  Your Honor, a couple of things.  I did not

17    ask for RDAP because Osaretin Omoruyi suffers no vice.

18            THE COURT:  Right, I won't ask for RDAP on that.

19            MR. TZENG:  And also he would be requesting Devens as

01:17 20    well, as it is the geographically closest.

21            THE COURT:  I will recommend that.  He's certainly not

22    violent in any kind of way.

23            MR. TZENG:  Thank you.

24            THE COURT:  I don't know, because he's possibly

25    deported, whether that's possible.  I never know whether they

1  will, but certainly I would like him to be as close as possible

2  to his family, who have been here throughout most of the trial

3  as well as the sentencing, so his children can visit him.

4          All right, read the notice of appeal rights.

5          THE CLERK:  Sir, could you please stand.  The Court

6  hereby notifies you of your right to appeal this sentence.  Any

7  appeal from this sentence must be filed with fourteen days of

8  entry of judgment on the docket.

9          Do you understand these rights?

01:17  10          DEFENDANT OSARETIN OMORUYI:  Yes.

11          THE CLERK:  All rise.

12          (Adjourned, 1:18 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2


3

  UNITED STATES DISTRICT COURT )
4 DISTRICT OF MASSACHUSETTS    ) ss.
  CITY OF BOSTON               )
5

6


7          I, Lee A. Marzilli, Official Federal Court Reporter,

8  do hereby certify that the foregoing transcript, Pages 1

9  through 93 inclusive, was recorded by me stenographically at

10 the time and place aforesaid in Criminal No. 21-10217-PBS,

11 United States of America v. Ozakpamwan Henry Omoruyi and

12 Osaretin Godspower Omoruyi, and thereafter by me reduced to

13 typewriting and is a true and accurate record of the

14 proceedings.

15         Dated this 6th day of February, 2024.

16

17

18

19

20
           /s/ Lee A. Marzilli
21         _____
           LEE A. MARZILLI, CRR
22         OFFICIAL COURT REPORTER

23

24

25